**Marie Louise JEANNERET, Plaintiff-Appellee,**

v.

**Anna VICHEY and Luben Vichey, Defendants-Appellants,**

and

**Constantine Vichey, Enrico Magenta, Giuseppi Frua DeAngeli, Alberta Ulrich DeAngeli, Bank Gut Streiff, Mr. Diner, Lorbeer Holding A.G., Estate of Carlo Frua DeAngeli, Mr. Gomrasca and Mr. Borella, as Executors or Administrators of the Estate of Carlo Frua DeAngeli, Estate of Ernesto Frua DeAngeli, Defendants.**

No. 59, Docket 82–7203.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1982.

Decided Nov. 12, 1982.

Joseph P. Marro, New York City (Kirschenbaum, Shapiro & Marro), New York City, for plaintiff-appellee.

Ludwig A. Saskor, New York City (Smith, Steibel, Alexander & Saskor, P.C., George M. Donaldson, New York City, of counsel), for defendants-appellants.

Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal by defendants in an action in the District Court for the Southern District

of New York, wherein federal jurisdiction was predicated on diverse citizenship, 28 U.S.C. § 1332, involves novel issues concerning the application of foreign laws requiring the obtaining of licenses or permits for exports of works of art.

## I.

The facts as developed at a trial before Judge Cannella and a jury were as follows:

Plaintiff Marie Louise Jeanneret, a citizen of Switzerland, is a well-known art dealer in Geneva. Defendants Anna and Luben Vichey, wife and husband, are citizens of the United States. Anna's father, Carlo Frua DeAngeli, had an extensive and internationally recognized private collection of paintings in Milan, Italy. One of these was a painting, Portrait sur Fond Jaune, by the renowned French post-impressionist, Henri Matisse, who was born in 1869 and died in 1954. The date of the painting is disputed; we shall have more to say about this below.

Carlo Frua DeAngeli died on July 30, 1969, and his property passed by will to his wife and three children. As a result of a settlement, evidently concluded after July 24, 1970, title to the Matisse painting ultimately vested in Anna Vichey.

The date and circumstances of the painting's exit from Italy are unclear. A letter from the Bank Gut Streiff in Zurich dated July 24, 1970, acknowledged Mrs. Vichey's one-third interest in nine paintings by famous artists deposited with the bank, as well as in a Carpaccio painting and a tapestry which the bank had sent to a New York art dealer. However, there are some references in the record to the painting's possible arrival in the spring or early summer. It is uncontroverted that no export license or permit was obtained from the Italian government; whether any such official document was needed is in dispute. Later in 1970 the Matisse painting was brought to the Vicheys' apartment in New York City.

In January 1973 Mme. Jeanneret began negotiations for the purchase of the painting, and an agreement was reached for its sale for 700,000 Swiss francs, then equivalent to approximately $230,000. Luben Vichey delivered the painting to plaintiff in Geneva in March 1973. Payment was made in June 1973 by a check drawn on the account of the Baju Trust, a Liechtenstein corporation wholly owned by plaintiff and later liquidated.[1] Plaintiff was obliged to borrow the money from a bank.

Mme. Jeanneret included the Matisse painting in a large exhibit of 20th century masters at her gallery in Geneva. The catalogue listed the Matisse as having been painted "vers 1924" and stated its provenance as the former collection Frua DeAngeli in Milan and a private collection in New York. The asking price was 1,300,-000 Swiss francs. She received at least three offers for the painting—one for 900,-000 Swiss francs, another for 1,000,000 and still another for 1,100,000, the last partly in cash and partly in exchange for another painting, but declined all as inadequate. The painting was also exhibited in Paris and Basel but again remained unsold at the price Mme. Jeanneret was asking.

In November 1974 plaintiff went to Rome. While there she encountered Signora Bucarelli, superintendent in charge of the export of paintings. Although the court excluded evidence of what Signora Bucarelli said, it allowed plaintiff to testify that as a result of the conversation Mme. Jeanneret telephoned Anna Vichey in the United States to ascertain the latter's knowledge as to how the painting had been exported from Italy. Anna referred plaintiff to her husband Luben who was in Milan. Luben in turn referred her to Dr. Magenta, the personal representative of the DeAngeli family, and to Mr. Diener, the

---

1. Although defendants admitted in their answer to the complaint that Mme. Jeanneret was the purchaser of the painting, defendants' counsel has since steadfastly asserted that any express or implied warranty ran only to the Baju Trust as purchaser and not to its "successor in interest", Mme. Jeanneret. We feel no injustice was committed in holding defendants to their pleadings in this instance. Mme. Jeanneret succeeded to any claims accruing to the instrumentality she employed for this transaction.

Swiss bank officer who handled the paintings for the Bank Gut Streiff. According to plaintiff Dr. Magenta referred her back to Luben or the other heirs of Carlo Frua DeAngeli.

There followed a letter from Mme. Jeanneret to Anna Vichey dated November 21, 1974. This reported that Signora Bucarelli was looking for the Matisse painting because she suspected its illegal exportation, and that as a professional art dealer plaintiff could not "sell it anymore nor show it." Mme. Jeanneret proposed that the deal be annulled; she would bring the painting to New York and the Vicheys would repay the purchase price.[2] On January 5, 1975, Luben Vichey wrote plaintiff rejecting her proposal. Other attempts to induce Mrs. Vichey to take back the painting were equally unsuccessful. This action, brought in July, 1977, was the result. The complaint was founded on breach of express and implied warranties of title, false and fraudulent misrepresentation, breach of contract, and a claim that defendants "used" plaintiff in a scheme of tax evasion.[3] Mme. Jeanneret sought to recover not merely the $230,000 paid for the painting but the higher value it would command absent the alleged defect in title and also damages for loss of business and reputation, which, with the usual addition of a claim for punitive damages, brought the total *ad damnum* to $5,000,000.

## II.

After Judge Cannella had denied a motion by the defendants for summary judgment, the case proceeded to trial before himself and a jury. There was much testimony on the Italian law concerning the exportation of works of art. Two different sets of provisions were involved. The first are the Regulations for the Execution of Law No. 364 of June 20, 1909, Approved by Royal Decree No. 363 of January 30, 1913 [hereafter "the 1913 regulations"]. Art. 129 of these required anyone desiring to export objects of historical, archaeological, paleontological, artistic or numismatic interest to present them to a royal office for the exportation of antiquities and art objects. Those seeking export licenses were required to file a declaration of the value of the objects to be exported. Royal officials, after examining the objects, had discretion to ban their exportation and could exercise a right of compulsory purchase at the declared value. The 1913 regulations also provided in Art. 130 that:

> Paintings, sculpture and any works of art made by living artists or not more than fifty years old, including copies and imitations, must be submitted to Export Offices or to the offices specifically set up pursuant to Art. 46 of Law No. 386 of June 27, 1907, in order to obtain an export permit.

The formalities involved in obtaining an export permit, as opposed to a license, appear to have been mainly fiscal in character. No declaration of the value of the object to be exported was required, and the export officer had no authority to deny a permit. Noncompliance with the permit requirement resulted only in a fine against the exporter, and objects seized for lack of an export permit were to be returned to the owner after payment of any storage and transport expenses.

The second set of provisions drawn to the attention of the court are contained in a statute of the Mussolini regime entitled "Protection of items of artistic or historical interest." Law No. 1089 of June 1, 1939

2. On December 10, 1974, a Milan attorney, Prof. Enrico Vitali, whom Mme. Jeanneret had consulted, answered a hypothetical question posed by her in a manner which, so far as we are able to understand it, opined that however serious the Vichey's position might be with respect to illegal exportation of the painting, Mme. Jeanneret would have no responsibility if she had acquired the painting and exported it from the United States to Switzerland in accordance with the laws of those countries.

3. In the latter count, plaintiff asserted that defendants violated the tax laws of the United States and Switzerland as well as those of

[hereafter, "the 1939 Law"].[4] Art. 1 of this law lists, in slightly greater detail, the objects of interest covered by Art. 129 of the 1913 regulations. However, Art. 1 expressly excludes works by living artists or which are not more than fifty years old.

Art. 2 of the 1939 law establishes a process of notification by which the Minister of Public Instruction gives formal administrative notice to owners, proprietors and holders of art works determined to be of particular interest to the Italian. Government. Such notification is kept on record and binds any successor in ownership, holder, or possessor of a beneficial interest in a work of art.

Art. 35 of the 1939 law prohibits the exportation from Italy of objects falling within the scope of Art. 1 when the items are of such importance that their export would represent a tremendous loss to the national patrimony protected by the law. Art. 36 requires anyone desiring to export objects specified in Art. 1 to apply to the Export Office for a license and to declare the market value of each object. Disputes between the exporter and the Export Office as to value are to be resolved ultimately by the Minister of Public Instruction. Within a period of two months after the declaration, the Minister is empowered under Art. 39 to purchase objects of particular interest to the national patrimony at their declared value.[5]

After having thus dealt with persons who comply with notification and export requirements, the 1939 law proceeds to deal with those who do not. Art. 61 directs that:

> Any transfer, agreement, or other legal act carried out against the prohibitions set forth in this law or without complying with the terms and procedures specified therein is null and void.

Art. 66 prescribes, so far as here pertinent, a fine of 200,000 to 15,000,000 lire when an item to be exported is not presented to Customs; moreover, the item may be confiscated in accordance with Customs laws and regulations pertaining to smuggled goods. When it is not possible to recover the item, Art. 66 directs proceedings according to the provisions of Art. 64. That Article provides that without prejudice to the provisions of Art. 66, if the item can no longer be traced or has been exported from Italy, the transgressor is required to pay the State the value of the item.

Much of the debate among the experts concerned the question whether the provisions of the 1913 regulations with respect to works of art by living artists or less than fifty years old survived the enactment of the 1939 law. The answer was agreed to lie in Art. 73 of the 1939 law, entitled Transitional Provisions, which reads as follows:

> The provisions of the regulations approved under Royal Decree No. 363(3) of January 30, 1913, shall remain in force, insofar as they are applicable, until such time as the regulations to be issued in execution of this law take effect.

This speaks with the clarity of the Delphic oracle. No regulations had been issued under the 1939 law by the time the Matisse painting had left Italy. Still, Art. 73 could mean that the 1939 law left in force only those 1913 regulations dealing with works that were more than fifty years old and thus within the scope of Art. 1. On the other hand, it could mean that all 1913 regulations which do not conflict with provisions of the 1939 law remain in force, especially those dealing with contemporary works beyond the scope of the later statute.

Although one would suppose the issue would long since have been resolved, by

---

Italy. This count was dismissed by the district judge at the close of plaintiff's evidence.

4. This opinion considers only those provisions of Italian law arguably in force during the period July 20, 1969, to July 24, 1970, when the Matisse painting departed Italy. The Italian Government subsequently amended its laws on the exportation of works of art, Law No. 487 of

August 8, 1972, to alleviate some restrictions on export to other members of the European Economic Community.

5. Although the law does not say so, we assume this means the lower of the declared value or the value determined by the Minister.

decision or practice, the district court was presented with conflicting opinions. Five treatises by Italian lawyers and one by Professor Merryman of the Stanford Law School took the view that, as stated by him, "a work no more than fifty years old is freely exportable." Art Law, Domestic and International 260 (Duboff ed.1975). Two Italian attorneys submitted affidavits to the same effect. To the contrary, opining that works by living artists or less than 50 years old at the time of export continued to be subject to the 1913 regulations, were two earlier Italian treatises, an affidavit by an Italian lawyer, the live testimony of another, and, at least inferentially, the live testimony of Dr. Carlo Bertelli, Superintendent in the Ministry of Cultural Heritage and Director of the Brera Gallery in Milan. The only relevant judicial decision cited, Corte cass., No. 3325, Aug. 5, 1957, 1958 Fori It. I 1940, gives a featherweight of support to the latter view.

### III.

The plaintiff introduced other evidence at trial. Mme. Jeanneret gave some figures as to her declining income as an art dealer; apart from the lack of any showing of causal connection with the difficulty here at issue, this line of proof largely collapsed when the witness admitted on cross-examination that she had misread certain figures in her income tax returns. John Tancock, a vice-president of Sotheby Parke Bernet auction house and head of its Department of Impressionist and Modern Painting and Sculpture, testified that, but for the question of illegal exportation, he would appraise the painting at $750,000. On the other hand, if the painting lacked "the necessary export documents from any country where it had been located", his opinion was that it would be impossible to sell the painting since "[n]o reputable auction house or dealer would be prepared to handle it". Hence "on the legitimate market its value is zero." He would date the painting "early

1920's, 1919, 1922, something like that." Nancy Schwartz, an art dealer associated with the Spencer Samuels & Company gallery in New York, testified that the gallery having received a number of requests for paintings by Matisse, she communicated with Mme. Jeanneret as to sending the painting to New York. Before any arrangements could be made, Ms. Schwartz wrote Mme. Jeanneret on May 1, 1975 that she would not be able to sell the painting as plaintiff had proposed to her in Geneva in February; "I had a client who was ready to buy it, but as you said that the painting left Italy clandestinely I realized that this painting cannot be sold." Graham Leader, an independent art dealer, identified letters he had written to Mme. Jeanneret from London in June and November 1974. In the former he stated that he expected a client in the next few days to whom he had indicated a price of 1,100,000 Swiss francs for the painting; in the latter he confirmed a telephone conversation announcing his refusal to consider handling the painting or advising one of his best clients to buy it "from the moment that I learned that the painting had been clandestinely exported from Italy by its former owner, Mme. Vichey-Frua DeAngeli and that it could thus be subject to suit by any authority." Finally, Dr. Bertelli, whose position we have already described, testified that Dr. Enrico Vitali, Mme. Jeanneret's lawyer, had called him to ask whether there was any record that the Matisse painting had been issued export documents after 1969 and that Dr. Bertelli had found no evidence that it had. On March 28, 1979, the Assistant Minister of Culture issued a notification pursuant to Art. 3 of the law of June 1, 1939, declaring the painting, "an important work by the French painter Henri Matisse, datable between 1920 and 1923", to be of "particular artistic and historical interest" within the meaning of the 1939 law and "therefore subject to all the regulations regarding custody included therein." [6] The decree was to

---

**6.** The somewhat surprising conclusion that exportation of a painting by a prolific French post-impressionist master would represent a

"tremendous loss to the national heritage" of Italy was sought to be justified on the grounds that it had been shown at the Venice Biennale

"be notified through administrative channels to the present owner, possessor or holder of this painting", to wit, Mrs. Vichey, in care of Dr. Magenta in Milan. Dr. Bertelli also testified that on September 17, 1981, just before he had left Milan to attend the trial, the Attorney General of Italy had shown him a memorandum indicating that a penal proceeding had been instituted against Anna Frua DeAngeli, that Interpol had been requested to recover the painting, and that the Chief of the Italian Delegation for Retrieving Works of Art had been asked to present the request of the Italian Government to the United States authorities.

The defendants' evidence was sparse. Mrs. Vichey professed ignorance of the details of the exportation. Luben Vichey testified on direct examination that he had first seen the Matisse painting at the Bank Gut Streiff in Zurich; that he had not known it was to be taken out of Italy; and that Dr. Magenta, Mrs. Vichey, and at least one of her brothers also didn't know this. On cross-examination he asserted that the paintings taken to Switzerland did have export documents for which Dr. Magenta had arranged.

The final defense witness was Kenneth Silver, an associate professor in the art history department at Columbia University. An effort was made to show that the painting was included in a catalogue of the Gallery of Bernheim Jeune, Matisse's Paris dealer, in a show held in 1922–23, but the ineptness of defendants' counsel resulted in this not getting to the jury.[7] He thought the painting was almost certainly "a '20s Matisse ... anywhere from early '20s, '22, '23, '24, maybe as late as '28. I don't think later than 1928." He would not date it as early as 1920 without doing research. Later he dated the picture as at the earliest "[a]bout 1921; I am not saying it is impossible to be '20 but I think it is more likely to be at the earliest '21." [8]

in 1952 "in the large exposition dedicated to art" and "because it is part of the era of 'a return to normalcy' which pervaded all Europe at the end of the first world war, characterized by a return to classic and Renaissance motifs particularly evident in this balanced, well composed painting by a master of contemporary art and specially rare among Italian collections of significant works of that period." One is tempted to wonder why if Italian collectors do not care enough for Matisse to buy his paintings, one of these, not claimed to be an outstanding masterpiece, should be thought to constitute such an important part of the Italian national heritage.

7. The judge properly ruled that defendants had not sufficiently established the authenticity of the catalogue to qualify it for admission as an ancient document under F.R.E. 803(16). Defendants' counsel apparently did not urge admissibility under F.R.E. 803(17). Of course, the catalogue would be only marginally relevant in the absence of evidence, which may well be available in the form of treatises or otherwise but was not offered, that at this stage of his career Matisse generally sold his paintings shortly after they were completed.

8. It is ironical that defendants' counsel should have staked their effort to establish the date of the painting on the opinion testimony of an expert which, in the absence of a date on or datable objects in the painting, could only be approximate, when they were aware of a document which, if adduced in evidence and uncon-

tradicted, would have established that Matisse painted this work during the season of 1922–23. In the course of pretrial discovery, defendants' counsel elicited that Mme. Jeanneret had received a letter dated July 20, 1977, from Paris from Matisse's daughter, Mme. Marguerite Duthuit, whom Mme. Jeanneret had characterized as a great authority on Matisse's work. Mme. Duthuit's letter stated without equivocation that the painting had been painted "during the 1922–23 season. By this I mean between the month of October, when Matisse arrived in Nice, and the months of April-May following when he left that city before the heat-wave common in that region at those times." Mme. Duthuit offered to remain at Mme. Jeanneret's disposition to maintain this. For reasons not explained, defendants' counsel did not take Mme. Duthuit's deposition. Indeed, they did not even interrogate Mme. Jeanneret at trial about her receipt of the Duthuit letter, which would have been permissible for the purpose of arguing that Mme. Jeanneret should have used the letter and any further information Mme. Duthuit could have supplied in an effort to convince the Italian authorities that exportation of the painting did not violate the 1939 law since it was not yet 50 years old in the spring of 1970. Defendants' counsel did request plaintiff to admit the authenticity of the letter but plaintiff never responded, and the matter was left at that.

## IV.

The district judge charged the jury, over objection by the defendants, that "[t]he mere casting of a substantial shadow over the title, regardless of the ultimate outcome of that dispute, is sufficient to violate a warranty of good title." Refusing defendants' requests to instruct the jury in detail on Italian law, partly on the ground, with which we sympathize, that he was "unable to determine what the Italian law is", and partly because in his view, the precise state of Italian law was "almost irrelevant" since plaintiff "didn't buy litigation", he charged in the manner set forth in the margin.[9]

·The jury returned a verdict for defendants on the first cause of action (breach of express warranty), and the third cause of action (fraudulent misrepresentation). It returned a verdict of $1,688,000 for plaintiff on the second and fourth causes of action (breach of implied warranty of title and breach of contract).

Defendants moved for judgment notwithstanding the verdict or for a new trial. By a memorandum and order, 541 F.Supp. 80, Judge Cannella denied the motion for judgment n.o.v. but granted the motion for a new trial unless plaintiff consented to a reduction of the amount awarded from $1,688,000 to $938,000.[10] Plaintiff accepted the remittitur. Judgment was entered dismissing the causes of action based on breach of express warranty, fraudulent misrepresentation and tax evasion and adjudg-

ing that, subject to her obligation to return the painting and execute such documents as might be necessary to transfer title, plaintiff should recover $938,000 from Anna and Luben Vichey. This appeal followed.

## V.

We begin by expressing surprise that defendants' counsel did not move to set aside the verdict as reflecting passion and prejudice. See *Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 521, 51 S.Ct. 501, 502, 75 L.Ed. 1243 (1931); *Taylor v. Canadian National Ry. Co.*, 301 F.2d 1, 2 (2 Cir.), cert. denied, 370 U.S. 938, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962); *In re Japanese Electronic Products Antitrust Litigation*, 631 F.2d 1069, 1090–91 (3 Cir.1980). When we inquired of appellee's counsel what rational basis there could have been for a verdict of $1,688,000, the only answer was that the excess over the figure allowed by the judge might represent compensation for loss of business or of reputation. As to the former, the judge's $4,000 figure seems to be liberal; as to the latter there was no evidence. Seemingly the jury doubled Tancock's $750,000 appraisal to $1,500,000 and added $184,000 for interest and $4,000 for other damages. The jury could well have been inflamed by some of Mme. Jeanneret's letters and the testimony that a penal proceeding had been instituted against defendant Anna Vichey and that Interpol had become involved. However, defendants' counsel did not raise this point either below

---

9. You have heard testimony about certain Italian customs and laws and regulations, and here I instruct you on the Italian law: There is a legal dispute involving Italian law as to what might happen to the painting if it is ever returned to Italy. A number of possibilities exist in this area. These are the possibilities:

First, the painting may be subject to confiscation.

Second, its owner, even if he purchased the painting in good faith, could be required to pay customs duties and/or fines. That's the second possibility.

The third possibility under Italian law is that nothing at all would happen either to the painting or to the owner.

I also instruct you if you find the painting was more than 50 years old at the time of export, then the possibility that the painting will be subject to administrative proceeding is greatly enhanced. It is for you to decide whether this legal dispute and the possible consequences thereof constitute a substantial cloud over the title to the Matisse under the definitions I have given to you.

10. This represented the estimated current value of the painting if free of title defects, $750,000, plus $184,000 interest expense incurred by plaintiff and $4000 "representing the maximum

or here,[11] and we therefore cannot consider it.

Both sides have assumed that defendants' liability is governed by the law of New York, where the negotiations for the sale of the painting occurred, rather than by the law of Switzerland, where it was delivered and payment received. We shall follow them in that assumption.

Section 2–312 of the Uniform Commercial Code as adopted in New York, Laws, 1962, c. 553, provides:

(1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that

(a) the title conveyed shall be good, and its transfer rightful; and

(b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

(2) A warranty under subsection (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

The Official Comment on this section states in part:

1. Subsection (1) makes provision for a buyer's basic needs in respect to a title which he in good faith expects to acquire by his purchase, namely, that he receive a good, clean title transferred to him also in a rightful manner so that he will not be exposed to a lawsuit in order to protect it.

.     .     .     .     .

The warranty of quiet possession is abolished. Disturbance of quiet possession, although not mentioned specifically, is one way, among many, in which the breach of warranty of title may be established.

4. This section rejects the cases which recognize the principle that infringements violate the warranty of title but deny the buyer a remedy unless he has been expressly prevented from using the goods. Under this Article, "eviction" is not a necessary condition to the buyer's remedy since the buyer's remedy arises immediately upon receipt of notice of infringement; it is merely one way of establishing the fact of breach.

There is nothing to show that defendants breached the warranty described in § 2–312(1)(a). No one denies that Carlo Frua DeAngeli was the lawful owner of the painting and that it passed by rightful succession to Anna Vichey. While Art. 61 of the 1939 Law provides that any transfers, agreements and legal acts in general carried out contrary to the law are null and void, no transfer, agreement, or comparable legal act occurred by virtue of the exportation to Switzerland; the heirs of Carlo Frua DeAngeli were exporting to themselves. The rights of the Italian Government were neither a "security interest" nor, in the normal meaning of language, an "other lien or encumbrance", especially if any weight is to be given here to the maxim *ejusdem generis.*

None of the cases from New York or other states cited by the district court deals

---

award for lost profits that the Court concludes is supported by the evidence adduced at trial."

**11.** Defendants' counsel did argue that the court instructed the jury improperly on the measure of damages for breach of an implied warranty of title. While we need not reach the question, we note that there is ample New York authority for the assessment of damages at the appreciated value of property at the time of trial. *Menzel v. List,* 24 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969); *Itoh v. Kimi Sales, Ltd.,* 74 Misc.2d 402, 345 N.Y.S.2d 416 (Civ.Ct.1973).

with a situation such as is presented here.[12] The cases holding that the buyer can recover simply by showing "[t]he mere casting of a substantial shadow over his title, regardless of the ultimate outcome", *American Container Corp. v. Hanley Trucking Corp.,* 111 N.J.Super. 322, 331, 268 A.2d 313, 318 (Ch.1970); *Ricklefs v. Clemens,* 216 Kan. 128, 133, 531 P.2d 94, 100 (1975); and *Catlin Aviation Co. v. Equilease Corp.,* 626 P.2d 857, 860 (Okla.1981), deal with what would be deemed defects in title or with liens or encumbrances in the ordinary meanings of those terms. Professor Nordstrom's seemingly apposite remarks anent a hypothetical sale of a painting in his Handbook of the Law of Sales 186 (1970) ("The buyer did not purchase a lawsuit. He purchased a painting."), lose force with respect to this case when it is realized that the author was discussing a true claim of lack of title.

The argument that there was no breach of the implied warranty created by § 2–312(1)(b) is strengthened by the terms of the Italian law and customary international law. Although Art. 66 of the 1939 Law says that the item may be confiscated, it goes on to say that confiscation is carried out in accordance with the Customs laws and regulations pertaining to smuggled goods, which can be done only in Italy. Professor Bator, in an important article, An Essay on the International Trade in Art, 34 Stan.L.Rev. 275, 287 (1982), has declared the "fundamental general rule" to be that "illegal export does not itself render the importer (or one who took from him) in any way actionable in a U.S. court; the possession of an art object cannot be lawfully disturbed in the United States solely because it was illegally exported from another country." [13] He adds that "[t]his general rule apparently obtains in all other major art-importing countries, including England, France, Germany, and Switzerland." Art. 64 of the 1939 Italian law makes clear that even when an item more than fifty years old has been exported from Italy, liability to pay the State the value of the exported item and any fine rests on the exporter, not on a purchaser. It is thus reasonably plain that so long as Mme. Jeanneret or any purchaser from her did not bring the painting back into Italy, it could not be confiscated and neither she nor a purchaser from her would be subject to monetary liability to Italy. There would seem no reasonable prospect that the United States or any other government would act on Italy's request for help in securing the return of the painting. This is especially true in light of the tenuous nature of the claim that a not especially notable painting by a French twentieth-century master who was testified to have left a thousand paintings constituted an important part of Italy's artistic patrimony, see note 6, *supra.* Matisse's Portrait sur Fond Jaune bore no such relation to Italy as a Raphael or a Bellini Madonna.

**12.** The goods purchased had been seized by the police as stolen property and turned over to a third party claimant in *John St. Auto Wrecking v. Motors Ins. Corp.,* 56 Misc.2d 232, 288 N.Y. S.2d 281 (Dist.Ct.1968); *Spillane v. Liberty Mut. Ins. Co.,* 65 Misc.2d 290, 317 N.Y.S.2d 203 (Civ.Ct.1970), aff'd, 68 Misc.2d 783, 327 N.Y. S.2d 701, 702 (Sup.Ct.1971); *City Car Sales, Inc. v. McAlpin,* 380 So.2d 865 (Ala.Civ.App. 1979), cert. denied, 380 So.2d 869 (Ala.1980); and *American Container Corp. v. Hanley Trucking Corp.,* 111 N.J.Super. 322, 268 A.2d 313 (Ch.1970). Goods were seized by police as stolen property and the purchaser recovered expenses incurred in successfully suing for their return in *Jefferson v. Jones,* 286 Md. 544, 408 A.2d 1036 (App.1979). Authorities notified a purchaser that goods were stolen, as a special master later determined them to have been, in *Ricklefs v. Clemens,* 216 Kan. 128, 531 P.2d 94 (1975). Goods purchased were found to be subject to chattel mortgages, liens, and security interests on file or asserted by third party claimants in *Marine Midland Trust Co. v. Halik,* 28 A.D.2d 1077, 285 N.Y.S.2d 136 (4th Dep't 1967), aff'd, 23 N.Y.2d 789, 297 N.Y.S.2d 297, 244 N.E.2d 868 (1968); *Kruger v. Bibi,* 3 U.C.C. Rep.Serv. (Callaghan) 1132 (N.Y.Sup.Ct.1967), and in *Wright v. Vickaryous,* 611 P.2d 20 (Alaska 1980); *Catlin Aviation Co. v. Equilease Corp.,* 626 P.2d 857 (Okla.1981). In *Skates v. Lippert,* 595 S.W.2d 22 (Mo.App.1979), the goods purchased required a certificate of title and this had been invalidly assigned to the seller.

**13.** Professor Bator finds the only exception to this rule to be a 1972 statute forbidding the import of any "pre-Columbian monumental or architectural sculpture or mural," codified at 19 U.S.C. §§ 2091–2095 (1976).

Against all this, however, we have the testimony of Mme. Jeanneret and of the three art dealers, Tancock, Schwartz, and Leader, here uncontradicted, that the painting could not be sold to any reputable art-dealer or auction house.[14] When we add to this evidence § 1–102(1) of the Uniform Commercial Code providing that

This Act shall be liberally construed and applied to promote its underlying purposes and policies.

and § 1–102(2)(b) providing that one of the Code's underlying purposes and policies is "to permit the continued expansion of commercial practices through customs, *usage* and agreement of the parties" (emphasis supplied),[15] we find it somewhat hard to reject the commonsensical view of the district judge that an art dealer who has bought a painting which, according to the usages of her trade, she cannot sell through ordinary channels is under a heavy cloud, indeed.[16]

We are reluctant to decide so serious a question, of particular importance to New York where so many of the country's art transactions take place, on such an unsatisfactory record and without even the slightest clue from the New York courts. Although we may ultimately be forced to decide the question without the benefit of further guidance from New York cases, defendants have at least made out a case for a new trial which may avoid the need for such a decision on our part.

We say this because in our view the court's instruction quoted in note 9 was erroneous in several respects. One was in saying that if the painting were returned to Italy, the "owner, even if he purchased the painting in good faith, could be required to pay customs duties and/or fines." We see nothing in the Italian law that imposes any such liability on a purchaser as distinguished from the exporter.[17] Much more important, the charge failed to focus the jury's attention adequately on the age of the painting when it was exported from Italy. The judge said only that if "the painting was more than 50 years old at the time of export, then the probability that the painting will be subject to administrative or judicial proceeding is greatly enhanced." For all we know the jury could have found that the painting was less than 50 years old when exported in the spring of 1970, yet nevertheless have rendered judgment for plaintiff because of violation of the 1913 regulations. As indicated at the beginning of this section, this jury apparently was strongly predisposed to allow the plaintiff to prevail. Even if the 1913 regulations are still in effect for paintings less than 50 years old, which we are inclined to doubt, violation of that law alone would not constitute a sufficient cloud to breach the war-

14. Three art auction houses including Sotheby Park Bernet, Inc., of which Tancock is an officer, and The Art Dealers Association of America have submitted a brief and reply brief as amici curiae in which they urge reversal on the ground that the contingency that the painting would be confiscated if returned to Italy is not a breach of the implied warranty of title. However, they do not address the factual issue raised by the testimony of the three art dealers beyond saying that Tancock testified on the basis of an assumption that export of a painting in violation of a foreign government's export regulation created a cloud on title. As shown by our summary of the evidence, this explanation is unfounded; Tancock was asked only to assume that the painting lacked the necessary export documents from any country where it had been located. Conspicuous by its absence are any statements that auction houses in fact would be willing to handle this Matisse painting and that this could be established on a new trial.

15. See also the sentence in the Official Comment to § 1–102 that the Act "is intended to make it possible for the law embodied in this Act to be developed by the courts in the light of unforeseen and new circumstances and practices."

16. We say this despite our agreement with Professor Bator, 34 Stan L.Rev. at 309, that, as a policy matter, embargoes as broad as Italy's should be discouraged. The sparsity of works by modern masters such as Matisse in Italian private collections, see note 6, *supra,* could well be due to the unwillingness of collectors to subject themselves to Italy's export policy.

17. To be sure, the owner might choose to pay disputed customs duties or fines in order to avoid further argument, but the court charged this as an additional liability.

ranty imposed by § 2–312(1)(b) and we decline to accept the argument that plaintiff could bring herself within that section merely by showing there was enough uncertainty about the painting's age that an export violation under the 1939 law should be treated as colorable. Even if we should ultimately agree with plaintiff that actual violation of the 1939 law would create an encumbrance sufficient to invoke § 2–312(1)(b), we would refuse, in the absence of instruction from the New York courts or a body of authority from courts of other states, to take the further step of holding that a claim of possible violation would suffice. If Mrs. Vichey was not in fact obliged to comply with the 1939 law with respect to the Matisse painting, it would be altogether too drastic to hold her liable to Mme. Jeanneret simply because the Italian Government now asserts that she was. In short, plaintiff had the burden of proving that Matisse painted the Portrait sur Fond Jaune before the spring or early summer of 1920.

Defendants argue in effect that plaintiff failed to present sufficient evidence on this subject to warrant submission to the jury. Certainly the weight of the evidence pointed to a later date. In the receipt which she gave Luben Vichey for the painting, Mme. Jeanneret dated it as 1924; however, she claims she did this at Vichey's instruction and had no independent knowledge. Her initial file card for the painting also gave a date of 1924. A revised file card bore a typewritten date which appears to be 1924; later the final 4 seems to have been changed in ink to 0. The card also bore a handwritten date of 1922 and of a sale in 1923, attributed to four important sources of information and followed by question marks. The catalogue for her exhibition gave a 1924 date. The sole evidence for a date as early as 1920 was Tancock's statement dating the painting as "early 1920's, 1919, 1922, something like that" and, if it can be so called, Silver's unwillingness to say it was impossible that the painting was done as early as 1920 although thinking it

more likely that the date was at earliest 1921. Assuming, perhaps somewhat charitably to plaintiff, that this evidence sufficed to meet her burden of overcoming defendants' contention that, as said in *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2 Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970), judgment n.o.v. should be granted when "(1) there is a complete absence of probative evidence to support a verdict for the nonmovant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair-minded men in the exercise of impartial judgment could not arrive at a verdict against him", the difficulty remains that the jury's attention was not sufficiently focused on the importance of the date of painting. There must therefore be a new trial at which, one would hope, more definitive evidence of the date of the painting can be provided [18]—unless, of course, the Italian Government should see fit to withdraw its notification or the parties should adjust their differences.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion.

---

**18.** This could include the Bernheim Jeune catalogue, a deposition by Mme. Duthuit, or evidence from the sources of information listed in the revised file card if any are still available. We do not mean, of course, that the new trial is limited to that issue.