**Robert L. ABERNATHY and Joyce Abernathy, Plaintiffs-Appellees,**

v.

**SUPERIOR HARDWOODS, INC., Defendant-Appellant.**

No. 82–2228.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1983.

Decided April 5, 1983.

Bruce P. Clark, Galvin & Galvin, Hammond, Ind., for defendant-appellant.

James A. Corrigan, Nevoral & Corrigan, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, and PELL and POSNER, Circuit Judges.

POSNER, Circuit Judge.

■ One day in 1978 Robert Abernathy drove a flatbed truck loaded with logs to a sawmill in Indiana owned by Superior Hardwoods. The logs were fastened to the bed of the truck with four chains. Abernathy released each chain but before he could stow them all in the cab of the truck Superior Hardwoods' forklift began unloading the logs and one tumbled off and hit Abernathy in the back. Abernathy and his wife sued Superior Hardwoods for negligence, basing federal jurisdiction on diversity of citizenship, and got a jury verdict. Superior Hardwoods has appealed, arguing first that there is insufficient evidence that it was negligent and Abernathy free from contributory negligence. Contributory negligence is a complete defense under Indiana tort law, see *Koroniotis v. La Porte Transit, Inc.,* 397 N.E.2d 656, 660 (Ind.App.1979), which is conceded to govern this case.

■ The appellant's brief states that "it is a common occurrence for logs to fall from the truck when being unloaded with a forklift, no matter how careful or prudent the operator of the forklift may be," and that there is no evidence that its forklift

operator was imprudent or unskillful in the manner in which he removed the logs from Abernathy's truck. But this takes too narrow a view of what due care requires. Dexterity in carrying out a dangerous procedure is only one way of avoiding accidents. Another is to take precautions. If, as the company itself argues, unloading logs from a flatbed truck is unavoidably dangerous, it should not be attempted until the driver is well clear. Abernathy testified that he had worked out with the operator a system by which the operator would not begin unloading till Abernathy gave him a hand signal, but that on the day of the accident the operator jumped the gun. The operator did not recall such a practice but the jury was entitled to believe Abernathy; the conceded dangerousness of the unloading procedure made his testimony at least plausible. If it did believe him, moreover, it would follow that the defendant was negligent whether or not due care required hand signaling, or some equivalent precaution, in the first place, on the same theory that if a railroad places a watchman at a crossing and the traveling public comes to rely on him to warn of an approaching train the railroad must tell the public before withdrawing the watchman—"must use reasonable care to see that reliance by members of the ... public upon its representation of safety is not converted into a trap." *Erie R.R. v. Stewart,* 40 F.2d 855, 857 (6th Cir.1930). See also *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955), and for Indiana authority *Clyde E. Williams & Associates, Inc. v. Boatman,* 176 Ind.App. 430, 435, 375 N.E.2d 1138, 1141 (1978); *Board of Comm'rs of Monroe Cty. v. Hatton,* 427 N.E.2d 696, 699 (Ind.App.1981).

■ Even if it did not believe Abernathy's story about hand signals the jury could have found that the failure to make sure he was well clear before the unloading began was negligence on the part of Superior Hardwoods, given the admitted danger of an accident if he was not well clear and the trivial burden of making sure he was before beginning to unload. According to Superior Hardwoods, such precautions are

not customary in its industry; but compliance with custom is not a defense to negligence. *Wiles v. Mahan,* 405 N.E.2d 591, 594 (Ind.App.1980); *The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.1932).

■ On the question of Abernathy's contributory negligence, Superior Hardwoods points to testimony that the logs on Abernathy's truck had been stowed (presumably by him) improperly. But the evidence was conflicting on the point and its resolution a matter for the jury. The defendant also argues that Abernathy should have heard the noise of the forklift beginning to unload and gotten out of the way. But he testified that the noise of the forklift was drowned out by the general noise of the sawmill, and whether it was or was not was again an issue for the jury—provided the district judge did not improperly limit the defendant's ability to present evidence of the noise level. That is the next issue we must resolve. The president of Superior Hardwoods made a videotape with his home videotape system showing a forklift unloading logs from a truck at the sawmill. The videotape was not a tape of the accident, of course—it was made several years later—or even an attempt to reconstruct the accident. It was an attempt (in the defendant's words) "to fairly and accurately depict the method in which log trucks are routinely unloaded at" its sawmill. The district judge allowed the tape to be shown to the jury but only with the sound turned off. Yet according to the defendant the soundtrack proves that Abernathy should have heard the forklift beginning to unload the logs.

■ The levels both of background noise and of forklift operating noise were relevant to the defense of contributory negligence, and there is no objection in principle to presenting evidence of noise levels through a sound recording, even one made long after the accident. Cf. *Young v. Illinois Central Gulf R.R.,* 618 F.2d 332, 337–38 (5th Cir.1980). But to be admissible—at least as a matter of law, rather than in the trial judge's discretion—the recording must, of course, meet minimum standards of reliability. E.g., *Renfro Hosiery Mills Co. v. National Cash Register Co.,* 552 F.2d 1061, 1065–66 (4th Cir.1977); *Brandt v. French,* 638 F.2d 209, 212 (10th Cir.1981). This one did not. The microphone was not placed where Abernathy had been standing when he was hit by the log, though it easily could have been; the recording was made by an amateur, using amateur's equipment; and there is no indication that in the courtroom the video recorder's volume control would have been adjusted to produce the same decibel level as the sounds actually recorded.

■ Although all of these points could have been brought out on cross-examination if the soundtrack had been played to the jury, a district judge is not required to encumber a trial with evidence of slight probative value merely because effective cross-examination might expose its weakness. Fed.R.Evid. 403; see *Panter v. Marshall Field & Co.,* 646 F.2d 271, 296 n. 8 (7th Cir.1981); *Texas Eastern Transmission Corp. v. Marine Office-Appleton & Cox Corp.,* 579 F.2d 561, 566–67 (10th Cir.1978); 1 Weinstein's Evidence ¶ 403[06] (1982). Juries have a tough enough time deciding cases intelligently even when they are not assailed by evidence of tangential relevance, and federal trials already take up enough time without being prolonged to receive such evidence. Nor can a district judge rely on counsel's self-interest not to offer worthless evidence. A lawyer with a weak case may throw in a lot of evidence just to confuse the jury—a tactic sometimes called "serving up a muddle." As the federal courts become ever busier, the need for district judges to manage trials with a firm hand becomes ever greater. The district judge in this case is to be commended rather than criticized for not taking the easy way out, which would have been to let in all the minimally relevant nonprivileged evidence either party cared to offer.

The defendant argues that Abernathy's medical witness, Dr. Miller, should not have been allowed to testify about the results of an electromyograph test that he ran on Abernathy, because the defendant's counsel

did not have a reasonable opportunity to prepare for cross-examination or introduce rebuttal testimony. The test was performed on May 24, 1982, and the plaintiffs' counsel got an oral report of the results on Friday, May 28. The trial was scheduled to begin the following Tuesday, June 1 (Monday being Memorial Day). A half hour before the scheduled opening of the trial the plaintiffs' counsel told the defendant's counsel that the test had been run and had been positive but that he had not yet received a written report. The defendant's counsel made no objection to proceeding with the trial. He was given an imperfectly legible copy of the test results the next morning and immediately moved the judge to order Dr. Miller, who was to testify that afternoon, not to refer to the test. The judge deferred ruling on the motion until Dr. Miller took the stand and the defendant's counsel had an opportunity to voir dire him concerning the test. Counsel did not avail himself of the opportunity; Miller testified; and counsel then moved for a continuance to allow him to procure rebuttal testimony. The judge refused either to exclude Miller's testimony or to grant a continuance, saying he didn't think Miller's testimony about the test results, which had been brief, had had a significant impact on the jury. If the judge had granted a continuance he would have had to postpone his next trial, which was scheduled to begin on June 7.

We have our doubts about the judge's stated reason for denying the motions, although we recognize that he was in a better position than we are to assess the impact of Dr. Miller's testimony on the jury. Abernathy undoubtedly had been injured badly when the log struck his back but it was unclear how severe the residual effects were at the time of trial, three and a half years after the accident, and what future difficulties he should expect. When Dr. Miller first examined Abernathy, more than a year before giving him the electromyograph test, the only observable symptom of a continuing back problem was that Abernathy's left buttock was thinner than the right (how much thinner the record does not reveal). Miller attributed the asymmetry to the accident's having injured the nerve running into the buttock from the spine. The EMG provided objective corroboration of his diagnosis—originally based just on visual observation—and of his testimony that Abernathy was 35–50 percent disabled as a result of the accident.

But in this case as in most cases tried under the Federal Rules of Civil Procedure surprise is a poor reason to exclude expert testimony, or to recess a trial for the purpose of allowing rebuttal testimony to be obtained and thereby break the jury's concentration and throw the trial judge's docket out of gear, when Rule 26(b)(4) makes it so easy to get pretrial discovery of the other side's expert evidence. Cf. *Connell v. Steel Haulers, Inc.*, 455 F.2d 688, 692 (8th Cir.1972). A personal-injury lawyer as experienced as the defendant's lead counsel in this case should not have been astounded to discover that an EMG—a standard diagnostic test for back injuries, see 1B Gray, Attorneys' Textbook of Medicine ¶ 14.43 (1982); 4 *id.* ¶ 182.42—had been run on Abernathy, and should not have been incapable of questioning Dr. Miller about the test without first consulting a medical expert ("I would need to be trained by a doctor as to what that report means before I could cross-examine him"), especially when by his own admission he had encountered EMGs previously in his practice. Counsel took a calculated risk in not retaining a medical expert either to testify or to assist him in cross-examination of the plaintiffs' expert without testifying, see Fed.R.Civ.P. 26(b)(4)(B). A lawyer who undertakes to cross-examine a medical expert without having his own expert at his elbow has only himself to blame if the witness utters some arcanum that the lawyer cannot understand.

Another reason the defendant's counsel should not have been surprised is that when deposed early in May Dr. Miller had indicated he might do an EMG on Abernathy. Counsel could have sought a commitment from the plaintiffs' counsel to make the results of any such test available to him

well before the trial, but he did not. Although the plaintiffs' counsel would have made life easier for the defendant by asking Dr. Miller to conduct the EMG earlier, it is a fact of life that trial preparations are rarely completed till the eve of trial, and there is no indication that the plaintiffs or their counsel were acting in bad faith. Cf. *Perma Research & Development v. Singer Co.,* 542 F.2d 111, 115 (2d Cir.1976). The problem of the illegibility of portions of the test report—again not contended to have been created deliberately—could have been cleared up quickly if the defendant's counsel had taken up the judge's invitation to question Dr. Miller before he testified.

■ The defendant also complains about the judge's refusal to allow a private investigator it had hired to testify that the records of Ryder Truck Lines contradicted Abernathy's testimony that Ryder had refused him a job because of his back. The investigator had gone to Ryder's headquarters, had looked through a log of job applicants, and had not found Abernathy's name. The proposed testimony would have been hearsay, and not being within any express hearsay objection would have been admissible only under the catch-all provision of the Federal Rules of Evidence, Rule 804(b)(5), which requires among other things that the evidence be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." The defendant knew almost two years before the trial that Abernathy was claiming to have applied for and been refused a job with Ryder; and even though Ryder's headquarters were more than 100 miles from the place of trial, the defendant could have subpoenaed and copied Ryder's records, deposed their custodian, Fed.R.Civ.P. 30(a), 45(b), (d), and if the custodian was unwilling to testify at trial placed his deposition in evidence, Fed. R.Evid. 804(b)(1), along with properly authenticated copies of the records themselves, Fed.R.Evid. 803(6). Such evidence would have been much more reliable than the private investigator's testimony. The district judge was not obliged to remedy the deficiencies of the defendant's trial

preparation. Rule 703 of the Federal Rules of Evidence, heavily relied on by the defendant, is irrelevant. It deals with expert testimony—testimony based on "specialized knowledge," Fed.R.Evid. 702—and such knowledge was not required to understand the list of applicants in Ryder's files.

■ The last and most difficult issue raised by this appeal is whether the verdict —$291,309 for the plaintiffs jointly—was so excessive that the defendant was entitled to a new trial. An initial question is whether this is an issue of state or federal law. If it is "substantive" it is an issue of state law, and if "procedural" an issue of federal law, but these terms are conclusions more than they are criteria. See, e.g., *Sibbach v. Wilson & Co.,* 312 U.S. 1, 16–19, 61 S.Ct. 422, 427–29, 85 L.Ed. 479 (1941) (Frankfurter, J., dissenting). The majority view is that the issue is procedural. See 11 Wright & Miller, Federal Practice and Procedure § 2802 (1973), and 1982 Pocket Part at pp. 5–6. *Galard v. Johnson,* 504 F.2d 1198, 1200 n. 1 (7th Cir.1974), so holds, but is in some tension with a number of Seventh Circuit decisions dealing with the related question (on which see generally *Evans v. S.J. Groves & Sons Co.,* 315 F.2d 335, 342 n. 2 (2d Cir.1963) (Friendly, J.)) whether in a diversity case the standard for directing a verdict for the defendant because the plaintiff's evidence of liability is insufficient is a question of state or federal law, and holding that it is the former. See, e.g., *Wieloch v. Rogers Cartage Co.,* 290 F.2d 235, 237 (7th Cir. 1961); *Moran v. Raymond Corp.,* 484 F.2d 1008, 1014 (7th Cir.1973); *Kuziw v. Lake Engineering Co.,* 586 F.2d 33, 35 (7th Cir. 1978). Although the decisions do not explain why state law should govern, do not cite other Seventh Circuit decisions that hold the opposite (also without giving reasons), notably *Gudgel v. Southern Shippers, Inc.,* 387 F.2d 723, 725 (7th Cir.1967), do not answer the strong criticisms in Wright, Law of Federal Courts 449–50 (1976), and do not discuss the many contrary decisions in other circuits—see, e.g., *Boeing Co. v. Shipman,* 411 F.2d 365, 368–70 (5th Cir. 1969) (en banc); *Yazzie v. Sullivent,* 561

F.2d 183, 188 (10th Cir.1977); but see, e.g., *McIntyre v. Everest & Jennings, Inc.,* 575 F.2d 155, 158 (8th Cir.1978)—or even *Galard* itself, they nevertheless can be defended, and maybe even reconciled with *Galard.*

■ The usual assumption is that the question whether state or federal law applies must be answered the same way whether the issue is the sufficiency of the evidence or the excessiveness of the verdict. See 9 Wright & Miller, Federal Practice and Procedure § 2525 at p. 553 (1971). But a rule determining how much evidence of liability a plaintiff must put in to defeat the defendant's motion for a directed verdict can be viewed as part of the definition of the plaintiff's substantive rights under state law rather than as a rule merely of jury control; it goes to liability, not just to amount of damages, and it determines the defendant's right to judgment and not just to a new trial. The difference is one of degree, though, and maybe not a big one under the "outcome-determinative" test of cases following *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), such as *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). That test is frequently disparaged on the ground that no issue that did not change outcomes would be worth arguing about; but it has a core of good sense: we ought not impart a systematic bias to the choice by diversity plaintiffs (or defendants who can remove) between litigating in federal and in state court, as we would be doing if we applied federal rather than state law to an issue that affected outcomes systematically rather than randomly. The rule that jury verdicts may be set aside as excessive works in only one direction—against plaintiffs. A federal rule more liberal than the applicable state rule would induce many diversity plaintiffs to shun federal court and would encourage defendants to remove, while a federal rule that was less liberal would cause plaintiffs to flock to federal court, from which defendants could not remove.

■ But against this must be set the fact that any rule on the scope of the judge's control of the jury has Seventh Amendment implications, see *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d 1061, 1065–66 (4th Cir.1969), and may therefore have to be regarded as a matter of federal law. There is also the practical consideration that the content of a sensible rule may be heavily influenced by rules of procedure, the composition or size of juries, or the role of the trial judge, all factors that may differ between a state and the federal court system. For example, if federal juries are more impartial on average than state juries because drawn from a larger area, or if federal trial judges are more active in guiding the jury than their state counterparts are, there is an argument independent of the Seventh Amendment for placing tighter limits on the power of federal judges to set aside verdicts as excessive.

■ But we need not try to resolve these interesting questions; here, as in most cases, see, e.g., *Longenecker v. General Motors Corp.,* 594 F.2d 1283, 1285 (9th Cir.1979), the state and federal standards for setting aside a verdict as excessive happen to be "virtually identical," as noted by a federal district judge who is a former Indiana appellate judge, *Johnson v. Baltimore & Ohio R.R.,* 65 F.R.D. 661, 666 (N.D. Ind.1974). Both Indiana and the Seventh Circuit allow the trial judge to set aside the jury's verdict only if it is grossly excessive, and in both systems appellate review of his refusal to do so is extremely limited because of his superior ability, by virtue of having observed the jury at first hand, to assess its fairness and competence. Cf. *United States v. Bruscino,* 687 F.2d 938, 941 (7th Cir.1982) (en banc). We therefore would not set aside a jury's verdict as excessive unless there was no rational connection between the evidence on damages and the verdict—unless, in other words, the verdict was "monstrously excessive," *Quilter v. Elgin, Joliet & E. Ry.,* 409 F.2d 338, 340 (7th Cir.1969), quoted in *Galard v. Johnson, supra,* 504 F.2d at 1199; or in the equivalent formulation of the Indiana courts "so excessive as to be flagrantly outrageous and extravagant." *State v. Daley,* 153 Ind.App.

330, 339, 287 N.E.2d 552, 557 (1972); see also *Richmond Gas Corp. v. Reeves,* 158 Ind.App. 338, 368, 302 N.E.2d 795, 815 (1973); *State v. Thompson,* 385 N.E.2d 198, 214 (Ind.App.1979).

Our review of the verdict in this case would be easier if the district judge had submitted the case to the jury on a special verdict (or a general verdict with special interrogatories) listing each item of damage separately. Fed.R.Civ.P. 49. Then the damage award would be simply the sum of the amounts awarded for each item. But neither party asked for such a verdict, and the judge did not submit one to the jury on his own initiative, as he could have done. 9 Wright & Miller, *supra,* § 2505 at p. 492 and n. 35, § 2511 at p. 522 and n. 31. Moreover, although the Abernathys' counsel asked the jury to award between $275,000 and $300,000—and the jury did—he did not explain the reasoning behind that range. Only one tangible, and incidentally undisputed, item of damage was submitted to the jury in precise quantitative form—Mr. Abernathy's medical bills, stipulated to be $3,333.25. The jury may have taken the exact midpoint of the range suggested by the plaintiffs' counsel, which would be $287,500, and added the medical expenses, or it may have added those expenses to $288,000, or it may have followed a different procedure altogether. Reconstructing a jury's thinking from a general verdict is often difficult and fruitless, and an additional complication here is that the stipulated medical expenses do not jibe with the last three digits of the verdict.

But we know the jury awarded damages, besides medical expenses, of about $288,000 and it may have derived that figure from the statement by plaintiffs' counsel in closing argument that it would not be unreasonable to give Mr. Abernathy $10 a day for the rest of his life to compensate him for his pain and suffering from the accident. The parties stipulated that at the time of the accident Mr. Abernathy had a life expectancy of a shade under 40 years, and $10 a day for 40 years is (ignoring leap years) $146,000. If the jury awarded the same amount to Mrs. Abernathy for loss of consortium, the total would be $292,000. (Although Mrs. Abernathy's life expectancy was longer than her husband's, this is irrelevant. You cannot claim loss of consortium for a period after your spouse's death unless the defendant's culpable acts accelerated his death, and there is no suggestion that the accident reduced Mr. Abernathy's life expectancy.) This is close to the roughly $288,000 that the jury awarded in addition to Mr. Abernathy's medical expenses.

We cannot see how the jury could rationally have based its verdict even in part on lost earnings. Though there was evidence that in the three years immediately preceding the accident Abernathy had earned $4,400, $9,500, and $2,600, respectively, and though Dr. Miller testified that Abernathy was 35–50 percent disabled, Abernathy has worked since recovering from the accident (not steadily, but he didn't work steadily before), and is disabled only to the extent of being unable to perform heavy work; and we find it hard to see what effect being confined to light work would have on an average annual income of $5,500 a year, which was at the time little if any more than the minimum wage for a full-time worker, and would be below it now. It is true that before the accident Abernathy worked intermittently, with frequent layoffs; and probably when he did work he received a higher hourly rate than he does now, for there is a wage premium (other things being equal) for heavy over light work. But neither the plaintiffs' counsel nor any witness tried to compute for the jury's benefit (or give the jury the figures from which it could itself have computed) the loss in hourly pay multiplied by the number of hours that Abernathy could reasonably expect to work for the rest of his working life. There was thus no factual basis for the jury's awarding lost earnings. Even if we were certain that Abernathy's partial disability had reduced or will reduce his hourly earnings or number of hours of work, we could not uphold an award of damages from lost earnings when the jury was given no evidence from which it could

estimate that loss in dollars. *Scott v. Nabours,* 156 Ind.App. 317, 321, 296 N.E.2d 438, 441 (1973); cf. *Jeanneret v. Vichey,* 693 F.2d 259, 265 (2d Cir.1982).

The question of damages for pain and suffering is more difficult. The accident was unquestionably a serious and painful one. Several of Abernathy's vertebrae were fractured, an operation was performed to remove a hematoma (a blood mass) that formed in his back as a result of the accident, and for six months after the accident he was in pain and could not walk normally or climb stairs. Also, two teeth were knocked loose, and later pulled. At the time of the trial Abernathy still had some sciatica (a pain running up and down the leg, typically caused by pressure on a nerve), though he was not taking any pain killers. Dr. Miller testified that he might recommend, although he had not yet done so, an operation on Abernathy's back to fuse the damaged vertebrae in order to alleviate the sciatica. Mrs. Abernathy testified that since the accident her husband had been very irritable and was unable to water-ski, dance, bowl, or go to the movies with her, or play outdoor games with their children.

Although Mr. Abernathy is entitled to a substantial award for the six months of pain and restricted movement that followed the accident, there is little evidence of pain or other disutility since then other than what can be inferred from his wife's testimony. Of course his back may get worse; and not only is a spinal fusion a dangerous procedure, because there is a significant possibility of its causing paralysis, but it often is unsuccessful in relieving pain. On the other hand, the evidence is uncontested that Abernathy was suffering from disc disease ("slipped disc") before the accident; his vertebrae were already beginning to disintegrate and press on the nerves. To someone already suffering from disc disease a back injury is a terrible thing; and the fact that a tort victim, because of a preexisting weakness, suffers a worse injury than a normal person would suffer is not in itself a ground for reducing his damage award. See, e.g., *Vosburg v. Putney,* 80 Wis. 523, 50 N.W. 403 (1891); *Johnson v. Bender,* 174 Ind.App. 638, 644–45, 369 N.E.2d 936, 940 (1977). But it is different when the weakness makes it likely that the injury complained of would have occurred anyway, so that the accident merely accelerated it. The "defendant has a right to offer evidence that the plaintiff was suffering from a disease and to prove the character and extent of the pain which would probably result from such disease, and to have this evidence considered by the jury in mitigation of damages ...." *Sherman v. Indianapolis Traction Co.,* 48 Ind.App. 623, 628, 96 N.E. 473, 476 (1911). See also *Louisville N.A. & C. Ry. v. Jones,* 108 Ind. 551, 559–61, 9 N.E. 476, 485–86 (1886); *Treschman v. Treschman,* 28 Ind.App. 206, 217–18, 61 N.E. 961, 965 (1901); *Steinhauser v. Hertz Corp.,* 421 F.2d 1169, 1173–74 (2d Cir.1970). A man who has disc disease yet does heavy work— Mr. Abernathy at the time of the accident—is quite likely in time to experience symptoms similar to those Abernathy experienced prematurely because of the accident. It is unreasonable to ascribe to the accident 100 percent of the back pain that he is expected to suffer over his lifetime.

We said earlier that the plaintiffs' counsel suggested to the jury that $10 a day would not be unreasonable compensation for Mr. Abernathy's pain and suffering. No figure was suggested for Mrs. Abernathy's loss of consortium but it could not be so great, and suppose it was $5 a day. Then the maximum verdict the jury could have awarded the Abernathys on their counsel's own theory would have been $219,000. But even this would be too much. In gauging the reasonableness of an award of damages for a future loss, the court must consider the present discounted value of that loss. See, e.g., *State v. Daley, supra; State v. Thompson, supra; O'Shea v. Riverway Towing Co.,* 677 F.2d 1194, 1199 (7th Cir.1982). If $15 a day would compensate the Abernathys for the damage (apart from medical expenses) that they can expect to suffer over the next 40 years, and they are

**974**

awarded $15 today for each day of future suffering, then assuming as we must that they will invest the money, however conservatively, they will have more than $15 when each of those future days rolls round—dramatically more, for the last days. (The present value at a 2 percent discount rate of $15 to be received in 40 years is $6.79.). Assuming that the plaintiffs' counsel was speaking in "real" (that is, inflation-free) terms—a reasonable assumption since he named a constant figure rather than one rising over time—the proper discount rate would have been the real, that is, the inflation-free, discount rate for riskless investments. That rate is usually estimated at 1–3 percent. *O'Shea v. Riverway Towing Co., supra,* 677 F.2d at 1198–1200. The present value of $219,000 to be received over 40 years, discounted at 2 percent, is $149,771.36. We cannot understand how an award of damages greater than the sum of this amount and the stipulated medical expenses of $3,333.25—$153,104.61 in total—could have been made consistently with the evidence, the instructions, and the closing argument of the plaintiffs' counsel (compare *Barker v. Cole,* 396 N.E.2d 964, 969 (Ind.App.1979), upholding a $50,000 verdict for much more serious orthopedic injuries)—especially when we consider how likely it is that Mr. Abernathy's pre-existing disc disease would eventually have caused him pain even if he had not had an accident but instead had continued doing heavy work.

If the plaintiffs are willing to accept a remittitur of $138,204.39 of the judgment ($291,309.00 – $153.104.61), we shall affirm the judgment as so modified. See 11 Wright & Miller, *supra,* § 2820, at pp. 133–34. Otherwise we shall remand for a new trial limited to damages. There will be no award of costs in this court.