[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**July 02, 2004**
**THOMAS K. KAHN**
**CLERK**

No. 03-13208

D.C. Docket Nos. 01-00324-CV-DF-5-4
and 01-00353-CV-DF

MARY MARGARET WRIGHT,
Administrator of the Estate of
Kevin Francis Wright, Jr.,
JILLIAN ALYCE WRIGHT,
b.a.t.
Mary Margaret Wright,

Plaintiff-Consolidated-
Plaintiff-Appellant,

versus

CSX TRANSPORTATION, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Georgia

**(July 2, 2004)**

Before ANDERSON, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

On February 3, 2001 in Vienna, Georgia, a locomotive operated by CSX Transportation, Inc. collided with an automobile carrying a family of four, with predictably tragic results. Three of the family members were killed and the fourth, a young girl, was seriously injured. A relative of the family filed two wrongful death lawsuits against the railroad in her capacity as administrator of the estates of two of those who were killed, and another suit against it in her capacity as next friend and guardian of the surviving minor. After those three lawsuits were consolidated for trial, a jury found for CSX. This is the resulting appeal, which raises issues involving three of the district court's jury instructions and two of its evidentiary rulings.

I.

On February 3, 2001, thirteen-year-old Jillian Wright and her twelve-year-old brother, Kevin Jr., were deposed in Albany, Georgia, in connection with a lawsuit resulting from their mother's death in an automobile accident in 1996. Their depositions were taken because they had been passengers in the car their mother was driving at the time of the fatal accident five years earlier. That night, after the depositions had been completed, they left Albany in an automobile

headed to Vienna, Georgia.  Their father, Kevin, Sr., was driving, and their stepmother Vivian was in the front passenger seat.

At approximately 9:15 p.m. as they drove in the town, the Wright family approached the Cotton Street railroad crossing from the west.  At the same time, a train operated by CSX approached from the south.

Because he had previously lived in that area, Kevin, Sr. was familiar with the roads of Vienna and with this particular crossing.  The Cotton Street crossing consists of three sets of tracks.  For a motorist crossing from west to east, as the Wrights were, the third set of tracks is the main line, or the set of tracks on which most trains operate.  The road over the tracks is uneven, and cars must drive over a hump to cross the main line tracks.  There is no crossing arm or warning bell.  Instead, there is a system that detects approaching trains and approximately thirty seconds before a train reaches the crossing begins flashing two red warning lights that are located to the side of the road just before a motorist enters the intersection.

There is a train switching area just to the south of the crossing, but motorists cannot see it because of a curve in the tracks.  The Cotton Street warning system detects any train within a half-mile of the crossing and starts the warning lights flashing.  If a train stops at the switching area, the system is designed to "time out" the warning lights eight seconds after the train stops moving toward Cotton Street.

3

If, during a switching maneuver, the train makes another movement toward Cotton Street, the warning lights will flash again until the eight-second "time out" mechanism turns them off.

Before the accident occurred, Vienna Police Chief David Musselwhite had received calls about the Cotton Street warning lights flashing when no train was coming and had observed the lights flashing "many" times himself. As of February 2001, Musselwhite says that several times per month the lights would flash but no train would come. Chief Musselwhite's office had reported these occurrences on the railroad's toll-free phone number. Leslie Hawkins, the CSX employee responsible for maintaining many crossing signals, including Cotton Street's, had received reports of "false positives" from some of his signals, but neither he nor CSX kept records of them. He did not remember receiving any reports of the Cotton Street signal malfunctioning in the months leading up to February 3, 2001. As a result of the fact that the warning lights often flashed when no train was coming, local residents and others familiar with the crossing often drove across the tracks while the warning lights were flashing.

Further complicating the crossing situation, a warehouse owned by CSX sits on the southwest side of the tracks and partially obstructs a motorist's view of the tracks to the south. On the night of February 3, 2001, CSX also had four tank cars

4

parked on one of the side tracks approximately 150 feet away from the crossing to the south. It was not unusual for the railroad to park cars on the Cotton Street side tracks.

According to Jillian Wright, the only occupant of the car to survive, when her father had driven through the Cotton Street crossing on prior occasions, he had stopped before driving over the first set of tracks and then stopped again in the space between the first and second tracks before crossing the rest of the way. The "black box" computer chip in the car's airbag system recorded that five seconds before the collision, the automobile was moving ten to eleven miles-per-hour. Two seconds before impact, it slowed to four miles-per-hour but never fully stopped until after the collision.

As the train approached the Cotton Street crossing from the south and the Wrights' automobile drove onto the crossing from the west, conductor Robert Gibbs and engineer Butch Cuddington blew the train's whistle. Gibbs could see that the red warning lights at the crossing were flashing. The train's headlights were on bright as it traveled fifty-seven miles-per-hour, which is three miles-per-hour below the federally regulated speed limit for the area. Gibbs and Cuddington saw a car cross onto the main line tracks, and Gibbs saw the woman in the front seat point at the train and turn toward the driver. At that point, Gibbs and

Cuddington saw the car appear to stop directly on the tracks, and Gibbs said, "We're fixing to wipe out a whole carload of folks." Cuddington applied the emergency brake, but to no avail. The train collided with the Wrights' car and finally came to a stop approximately a half-mile after the point of impact. Even before the train came to a stop, Gibbs radioed for help.

Within moments of the collision, Emerson Lundy, an off-duty Vienna police officer, arrived on the scene. As he and Gibbs ran to check on the car's passengers, Gibbs said, "The guy, you know, he stopped," and, "Why did he do that?" At trial, Gibbs speculated that Kevin, Sr. had panicked and slowed down to try to back off the tracks instead of moving forward.

Three of the car's four occupants – Kevin, Sr., Kevin, Jr., and the children's stepmother, Vivian – were declared dead on the scene. Thirteen-year-old Jillian survived. It took an hour to get her out of the car using a "jaws of life" device. She was air-lifted to a hospital in Macon, Georgia, where treatment for her many serious injuries began. At the time of the trial in September of 2002, she was still receiving treatment for some of her physical and psychological injuries.

Four lawsuits were filed as a result of this accident. Mary Margaret Wright, the mother of Kevin, Sr., and grandmother of the two children, filed one wrongful death lawsuit in her capacity as administrator of her son's estate, another one as

6

administrator of her grandson's estate, and a third lawsuit as next friend and guardian for her granddaughter. Those three lawsuits were consolidated and tried to a jury. (Another lawsuit arising from the death of the fourth occupant, Vivian Wright, settled.)

After the jury returned a verdict in favor of CSX and the district court denied Wright's motion for a new trial, Wright filed this appeal, contending that three of the jury instructions were improper, that the trial court wrongly excluded evidence of a prior collision at the Cotton Street crossing, and that CSX should not have been permitted to demonstrate a train headlight for the jury.

## II.

Wright contends that three of the district court's jury instructions were improper. We apply "a deferential standard of review to a district court's jury instructions. If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording." Eskra v. Provident Life & Acc. Ins. Co., 125 F.3d 1406, 1415 (11th Cir. 1997) (internal quotation omitted). We review de novo whether an instruction accurately reflects the law. Id.

## A.

Wright first contends that the district court erred in instructing the jury about "false activations." The district court's instruction was:

There has been no evidence that the warning signal lights did not function properly at the time of the accident.

You have heard evidence that, in the past, the warning signal lights at the Cotton Street crossing have activated at times when no train traveled through the grade crossing. Now, Defendant [CSX] can be held liable for previous warning signal light activations when such activations constitute "false activations" as defined by Federal Law and the Defendant failed to properly repair the condition. In this case there is no evidence that there was a "false activation" or that Defendant failed to properly repair such a condition. Federal Law provides that a false activation is one caused by a condition that requires repair of the grade crossing warning system. However, Federal Law also requires Defendant to maintain warning signal lights that activate when trains come within a certain distance of the crossing, regardless of whether or not the train travels through the crossing. Therefore, the mere fact that no train travels through the crossing when the warning signal lights activate, by itself, is not sufficient evidence to demonstrate any negligence by Defendant.

Under 49 C.F.R. § 234.5, "'[f]alse activation' means the activation of a highway-rail grade crossing warning system caused by a condition that requires

correction or repair of the grade crossing warning system. (This failure indicates to the motorist that it is not safe to cross . . . when, in fact, it is safe to do so.)" Wright argues that the district court erred by omitting the parenthetical language about misleading motorists when defining "false activation" for the jury. However, the district court's definition of "false activation" was legally accurate. The court's decision to omit the explanatory, parenthetical phrase did not mislead or confuse the jury about the meaning of "false activation" in the context of this case, because the district court accurately instructed the jury that a false activation is one caused by a condition that requires repair. The parenthetical language of 49 C.F.R. § 234.5 explains what effect a false activation may have, but if there is no activation caused by a condition requiring repair, then there is no false activation within the meaning of the regulation to begin with. The district court's instruction conveyed this to the jury.

Wright also contends that she presented evidence of false activations (or "false positives") at the crossing and that the jury should not have been told otherwise. There is no dispute that the Cotton Street red warning lights were flashing as the Wrights entered the crossing just before the collision, and that was no false positive. The parties' disagreement is over whether the lights had activated falsely in the past, thus lulling motorists into believing it was safe to

9

cross when the lights were flashing, and whether CSX failed to recognize and correct such a problem.

Wright's evidence came primarily from Police Chief Musselwhite, who testified that his office had received complaints about the Cotton Street lights and that he had seen the Cotton Street lights flash and had notified the railroad. He testified that "many times a month" the Cotton Street light would flash when no train was coming. Jillian testified that she was present when her father talked to some unidentified person about how the Cotton Street warning lights flashed when no train was coming. In her brief, Wright emphasizes that Hawkins admitted that there were frequent false activations, but Hawkins never made such a statement in reference to the Cotton Street signal. On the contrary, he testified that he did not remember any false activations by the Cotton Street signal in the months leading up to the collision in February 2001.

At trial CSX took the position that there had not been a "false activation" as defined by 49 C.F.R. § 234.5. Signal maintainer Hawkins explained that in order to give a thirty-second warning to motorists when a train approached at the maximum permissible speed of sixty miles-per-hour, the system had to detect

trains a half-mile before they got to the crossing.[1]  This meant that when trains approached but then stopped for switching maneuvers, the Cotton Street warning system would detect the train's approach and the lights would flash until the "time out" period passed.  He also explained that after the "time out" period, the lights would reactivate if the train moved again.  According to Hawkins, when this occurred the system was working properly and as it was designed to work, and was not in a condition requiring repair.  There was no contrary evidence about how the system was designed to work.

Wright's evidence of "false activations" showed that the public perceived a problem with the Cotton Street lights but not that the warning system ever activated due to a "condition that requires correction or repair of the grade crossing warning system" as specified in 49 C.F.R. § 234.5.  The district court's instruction to the jury accurately defined "false activation" under federal law and accurately stated that Wright had not presented evidence of an activation matching that definition.

---

[1] The minimum amount of warning allowed is twenty seconds.  49 C.F.R. § 234.225 ("A highway-rail grade crossing warning system shall be maintained to activate in accordance with the design of the warning system, but in no event shall it provide less than 20 seconds warning time . . . .").

B.

Wright next challenges the district court's instruction not to consider the train's speed. The district court charged the jury:

[I]n determining whether Defendant was negligent, you are instructed that you are not to consider the speed that the train was traveling on the night in question. . . . You are instructed, as a matter of law, that because the Defendant was in compliance with Federal Law, it was not negligent with respect to the speed that the train was operating at the time of the collision.

The Federal Railroad Safety Act, 49 U.S.C. § 20101, et seq., and federal regulation of train speeds preempt common law claims for excessive speed. CSX Transp., Inc. v. Easterwood , 507 U.S. 658, 676, 113 S. Ct. 1732, 1743-44 (1993). That act provides: "Laws, regulations and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. In objecting to the district court's speed instruction, Wright's counsel acknowledged that they could not "charge the railroad with violating Federal speed rules" and that they "had no evidence of that."

Although pure excessive speed claims are preempted, the Supreme Court has expressly declined to decide whether a claim for "breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual

12

hazard" is preempted. Easterwood, 507 U.S. at 675 n.15, 113 S. Ct. at 1743 n.15.

We addressed the possibility of a claim based on a "specific, individual hazard" in

Michael v. Norfolk S. R.R. Co., 74 F.3d 271 (11th Cir. 1996). The plaintiffs there

presented evidence that the crossing gate at the intersection where the collision

occurred had consistently malfunctioned for years; it would not go down as a train

passed, or it would go up and down in a hatchet-like motion. Id. at 272. We

remanded for the district court to determine if the plaintiffs had established

sufficient evidence of a violation of a "related tort law duty" to present a jury issue

about whether the train should have slowed for the dangers of this particular

crossing. Id. at 273-74.

Wright takes exception to the district court's speed instruction because she

wanted the jury to consider whether CSX, in exercising due care under general tort

law, should have slowed its train because of the warehouse, parked tank cars, and

local motorists' belief that the warning lights flashed when no train was coming.

Wright argued before the district court that speed was an issue in the case because

of the sight obstructions at the Cotton Street crossing.[2] During the district court's

_____

[2] Prior to opening statements, Wright's counsel argued, "We are going to say that ordinary care required them . . . to slow down." He later asserted that a "particular hazard" meant "that in addition to the building, they park four tank cars further obscuring the view." During the charge conference, Wright's counsel objected to the speed instruction, stating "I mean that the jury can consider the speed of the train in reaching its verdict. . . . There is evidence in this case about the time factor" of when Kevin, Sr. was first able to see the train approaching.

13

consideration of the "specific, individual hazard" question, Wright did not raise the alleged history of false activations of the warning lights.

There are buildings adjacent to train tracks throughout the United States, so the warehouse near the Cotton Street crossing is not a unique, individual condition. Likewise, there is no evidence that railroad cars parked near tracks are unusual. To the contrary, the evidence presented indicated that was a common occurrence. There was evidence that local motorists regularly drove across the tracks in defiance of the flashing red warning lights. But that was not the basis of Wright's objection to the jury instruction ruling out the consideration of the train's speed. We can reverse on a different ground than that cited in an objection only if "the error is so fundamental as to result in a miscarriage of justice if a new trial is not granted." Bendiburg v. Dempsey, 19 F.3d 557, 562 (11th Cir. 1994) (internal quotation omitted).

As we have discussed, Wright failed to prove a history of actual, malfunction-induced false activations at Cotton Street. The evidence indicated that the warning system functioned properly and activated whenever a train approached the crossing, although the trains did not always proceed through the crossing. What Wright proved was that people familiar with the crossing, including Kevin, Sr., believed that the lights sometimes activated for no reason.

14

We cannot say that failing to instruct the jury to consider the train's speed in light of a mistaken public perception about how the warning system operated is a fundamental error.

## C.

The final instruction with which Wright takes issue concerns the installation and maintenance of the warning light system at the Cotton Street crossing. The district court instructed the jury:

> Additionally, you are instructed that any evidence about traffic-control devices may not be used to find the Defendant was negligent in this case. Under Georgia law, the duty to install and maintain traffic control devices at railroad crossings lies exclusively with the local government. And the determination of need and selection of traffic control devices at a grade crossing is made by the public agency with jurisdictional authority at those specific locations.

> Moreover, private entities, such as railroads like Defendant, are prohibited from placing traffic control devices on public roads. Accordingly, any belief you hold as to whether there were adequate traffic control devices at the crossing in question should not affect your determination in this case as to whether or not Defendant acted negligently.

15

Wright's disagreement with this instruction arises from the court's use of the phrase "the duty to . . . maintain traffic control devices." This disagreement stems from two possible meanings of the word "maintain"–to repair is one, and to retain and continue in use is the other. As Wright correctly points out, under Georgia law, CSX had a duty to repair (or "maintain" in that sense) the warning signal system. See Ga. Code Ann. § 32-6-200(b)(3) ("The railroad . . . shall maintain all protective devices . . . ."). However, the duty to install and retain (or "maintain" in that sense) a certain type of warning device belongs to the local government. See Ga. Code Ann. § 32-6-50(c)(1) ("Counties and municipalities shall place and maintain . . . such traffic-control devices as are necessary . . . .").

Wright does not quarrel with the court's instruction that the jury could not consider the adequacy of the signal light or the need for any additional warning device. Instead, she argues that by using the word "maintain" in connection with the duty of the local government, the instruction was legally incorrect and confusing because it told the jury that CSX did not have the duty to repair the warning signal system.

Viewing the jury instructions as a whole, we disagree. After the court instructed that "the duty to install and maintain traffic control devices at railroad crossings lies exclusively with the local government," the court summed up the

16

instruction by informing the jury that its belief about the adequacy of the warning lights had no bearing on whether CSX was negligent. In the instruction immediately following this, the court told the jury: "[CSX] can be held liable . . . [if it] failed to properly repair" the warning system. Taking all of the instructions together, the jury was properly informed that CSX could not be held liable for the decision about which warning device to put in place or continue in place, but it could be held liable for any failure to repair an existing warning light.

III.

We now turn to Wright's two evidentiary arguments: that the district court should not have excluded evidence of a 1991 train-car collision at the Cotton Street crossing, and that the district court should not have permitted CSX to perform a demonstration of a train headlight for the jury. We review the district court's evidentiary rulings only for an abuse of discretion and will not reverse unless an erroneous ruling "resulted in a substantial prejudicial effect." Brough v. Imperial Sterling Ltd., 297 F.3d 1172, 1179 (11th Cir. 2002).

A.

Wright wanted to introduce evidence of a prior train-car collision, the Pierce collision, which occurred at the Cotton Street crossing on May 11, 1991. Evidence of a similar past occurrence may be introduced if the conditions of the

17

past incident are similar enough to those of the current incident and if the past incident was not too remote in time. See Borden, Inc. v. Fla. E. Coast Ry. Co., 772 F.2d 750, 755 (11th Cir. 1985). If these criteria are met, the past occurrence is admissible to show that the defendant had notice of a particular danger. Id.

The district court excluded evidence of the Pierce collision, reasoning that it was too remote in time, having happened nearly ten years before the Wrights' tragic accident, and that the conditions were too dissimilar, because the Cotton Street crossing had five sets of tracks, not three, in 1991. We cannot say that the district court's ruling was an abuse of discretion, particularly in light of the fact that evidence was admitted of a more recent collision at the same crossing.

Wright was allowed to introduce evidence of a collision that occurred at the Cotton Street crossing, the Hoker collision, in 1999. That collision was much closer in time and occurred when the number of tracks at the crossing was more similar to what it was when the collision that gave rise to this case occurred in early 2001. Thus, Wright was not precluded from arguing notice to CSX on the basis of a prior accident, and CSX was not able to argue that there had never been a collision at the crossing. See Borden, 772 F.2d at 756 (exclusion of a past similar occurrence is prejudicial if the party needed it to establish "a particularly

18

crucial issue in dispute" or if his opponent used the absence of a prior incident against him).

B.

As for the headlight demonstration, CSX wanted to demonstrate the train's headlights to the jury during its case in chief. The demonstration would have involved placing train headlights along the back wall of the courtroom, turning them on, and having the jury walk in front of the bench at the other end of the courtroom to view the lights. CSX's theory was that the headlights created a "halo" or "starburst" effect so that the light would bend around any obstructions at the crossing and be visible to an approaching driver. The district court refused to allow the demonstration and ruled that CSX's photographs of a train with its headlights on at night were sufficient to make the point it wanted to make with the demonstration.

After CSX introduced the photographs during its case in chief, an expert for Wright testified on rebuttal that the photos were "altered," "totally unrealistic," and "totally unreliable and incorrect." He opined that the lights in the photo looked bright and had the "halo" effect solely because the film had been manipulated and over-exposed, and that the photos were not a true representation

19

of what a person would see when looking at a train's lights. CSX then sought to introduce its headlight demonstration as an answer to that rebuttal.

The district court viewed the demonstration outside the presence of the jury and decided to allow only one headlight (the locomotive's center headlight) to be displayed briefly. CSX's foundation witness testified that the demonstration light was of the same design, voltage, and wattage and used a bulb that was identical to the one in the light on the train that had collided with the Wrights' automobile. The court explained to the jury that CSX's witness was for rebuttal and then permitted the courtroom lights to be turned off and the headlight to be displayed as the jury walked across the courtroom. After the jury viewed the light, Wright's counsel cross-examined CSX's foundation witness about the difference in conditions between the courtroom and the Cotton Street crossing at night and emphasized that the light could not shine directly through the warehouse and parked tank cars. Wright's counsel also turned the light back on and blocked it to let the jury determine whether the same halo effect was visible when the direct glow was obstructed.

Wright argues that although her expert opened the door for rebuttal as to the accuracy of CSX's photos, the district court should have excluded the demonstration as prejudicial. To support this argument, Wright relies on

20

Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963 (7th Cir. 1983), which she contends stands for the proposition that a trial court must exclude any demonstration that attempts to recreate some aspect of a collision scene when the conditions of the collision cannot be replicated. However, the Seventh Circuit actually held in Abernathy that when a demonstration (offered there as part of the case in chief, not just for rebuttal) differs from the actual conditions of the collision, the trial court has the discretion whether to admit it and allow the differing conditions to be highlighted on cross-examination. See id. at 968. That is exactly what happened here. In addition, the district court here lessened the risk of prejudice by restricting the demonstration (allowing only one light and keeping it short.) There was no abuse of discretion.

IV.

The judgment of the district court is AFFIRMED.