[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 25, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-15803
Non-Argument Calendar
_____

D. C. Docket No. 07-60253-CV-JEM

GEORGE LIPS,

Plaintiff-Appellant,

versus

CITY OF HOLLYWOOD,
 a Florida Municipality,
OFFICE CHERIE STETKAR,
OFFICER KAREN ZORSKY,
OFFICER FRANCIS HOEFLINGER,
OFFICER ROBERT GIANINO,
OFFICER DONAL BAIRERLEIN,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the
Southern District of Florida
_____

(September 25, 2009)

Before BIRCH, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

George Lipps appeals the judgment on the jury verdict for the defendants-appellees the City of Hollywood ("Hollywood") and officers Cherie Stetkar, Karen Zorsky, Francis Hoeflinger, Robert Gianino, and Donald Bairerlein (collectively, "Officers"), and the denial of his motion for a new trial in his 42 U.S.C. § 1983 action alleging that his constitutional rights were violated when he was arrested without probable cause and with excessive force. We find that the district court did not abuse its discretion and affirm.

## I.  BACKGROUND

In 2005, Lips was living in Hollywood, Florida with his wife, Gloria Lips ("Gloria") and son, Joshua ("Josh") Lips.[1] On 27 March, Gloria and Josh went out while Lips stayed home, had a couple of drinks, and fell asleep on the couch. After Gloria and Josh returned home, Lips left the house around 11:30 P.M. to avoid an argument, and Gloria called 911 to complain that Lips was drunk and planning to drive. She requested that the officers intercept him at either their residence or along the route that she expected him to take and stop him from driving. The

---

[1] In 2005, Lips and Gloria had been married for almost twenty years, but separated for about eight years. Gloria and Josh had moved back into the house a few months before the incident, but fought a lot. Lips and Gloria divorced in 2007.

2

officers went to the Lips' home, but departed because Lips was not there. After

Lips returned home, he and Gloria argued. Gloria again called 911 and the

Hollywood Police Department was again dispatched to the residence for a "violent

domestic disturbance."[2] R10 at 421-422; R12 at 783, 838, 844, 846, 868. Officers

Stetkar and Zorsky were the first to respond, and Officers Gianino, Bairerlein and

Hoeflinger arrived a few minutes later. Lips was subsequently arrested.

As a result of injuries that Lips claims he incurred during the arrest, Lips

filed an action alleging, inter alia, that Hollywood was liable under Florida law for

his false arrest and the officers' use of excessive force during the arrest, and that

the Officers were liable under § 1983 for arresting him without probable cause and

using excessive force during the arrest.[3] The case proceeded to a jury trial. The

jury returned a verdict for Hollywood and the Officers on all counts.

Lips filed his civil action against Hollywood and the Officers in 2006. The

deadlines were October 2007 for the exchange of expert witness reports and

November 2007 for all discovery, and trial was set for February 2008. In

December 2007, Lips sought to reopen discovery for neuropsychological testing

---

[2] A "violent domestic disturbance" was defined as a situation where there was "trouble" in a home with the possibility that someone could be hurt by hand or a weapon. R12 at 846. The standard police policy for such a disturbance was to make contact with the complainant, and then separate the involved parties to diffuse any situation.

[3] Lips initially also brought civil rights claims against Hollywood but subsequently dismissed them.

because his physician had determined that Lips' mental condition had significantly deteriorated and because a psychologist had recently evaluated him as incompetent to stand trial in a driving while intoxicated prosecution. The district court observed that it was "troubled" by Lips' lack of diligence, found that reopening and extending the discovery period would "severely prejudice" Hollywood and the Officers, and denied the motion. R3-69.

In January 2008, Lips renewed his motion for neuropsychological testing and requested an unopposed continuance due to his counsel's trial schedule. Lips explained why the testing issue had not been raised earlier, and submitted two additional psychological evaluations opining that Lips' mental condition was severe. The district court again denied the requests, as well as Lips' subsequent motion for a continuance or for a specially set trial date. A few days later, the district court denied Hollywood and the Officers' motion for summary judgment.

With the trial date set for 4 February 2008, Lips filed an unopposed motion for continuance and for reconsideration of the denial of neuropsychological testing and an evidentiary hearing, based on a state criminal court's determination that Lips was incompetent to stand trial. The district granted Lips' motion for continuance, reopened discovery until 8 February 2008, and rescheduled the trial until 28 February 2008.

After Lips' psychological tests and interviews were timely completed, Lips

4

sought an extension of discovery until 25 February to obtain and exchange the written expert reports by 19 February, and a trial continuance until 10 March based on his attorney's trial schedule conflicts. The motion was granted.

On 21 February 2008, two days after the date upon which the parties had agreed to exchange expert reports, Hollywood and the Officers submitted the report of Dr. Jacqueline C. Valdes. Lips moved for a continuance on 22 February in order to depose Dr. Valdes and to permit his expert to assess Dr. Valdes's conclusion that Lips was a malingerer. At the 28 February 2008 calendar call, the district court granted a trial continuance until 17 March 2008 but denied any further extensions.[4]

Trial began on 17 March. The district judge announced that he would initially question and interview the jury panelists with the submitted questions, then might allow the lawyers to question the jury, and overruled Lips' counsel's objections that he be permitted to personally question the jurors.[5] R9 at 4-7. The district judge explained to the jury that he would be questioning about them to

---

[4] Although the district court initially denied Lips' motion for continuance, it granted the motion after Lips' attorney argued that he was sick and had been in trial for a week, and that Lips was in jail, and after the Officers' attorney advised that one of the officers was hospitalized. Lips' attorney suggested that if discovery was continued he would be able to depose Valdes, but the district court responded that the prior discovery extension was all it was permitting.

[5] In the May 2007 order setting the pretrial schedule and the 31 January 2008 trial date, the parties were directed to submit proposed voir dire at least one day prior to the calendar call. Hollywood and the Officers submitted their questions, which the district court incorporated those into its own questions. Lips did not submit any questions. See R9 at 5, 81.

determine whether their decisions would be improperly affected by their experiences, knowledge, or opinions, in order to obtain jurors who would impartially try the case upon the evidence submitted without influence from other factors. During the district court's 74 minute voir dire, 21 panelists were interviewed about their personal histories for five years prior to the trial date. The questions focused on their and families' occupations, their residence location and length of occupancy, their marital status, their and their families' military service, their involvement in lawsuits or on juries, and any physical, emotional, or language problems that would hinder their service.

The first panelist, Moises Richard Ramy, was a Department of Corrections psychologist who indicated that he would have a problem being fair; he was excused. Shane Rawluk was a Miami-Dade County police dispatcher who indicated that he knew of no reason that would prevent him from sitting on the jury and rendering a fair verdict. After Lips objected, the district court asked him an additional question about the effect of his job on his jury service but Rawluk said it would have no effect. Marianela Perez was employed as a Miami-Dade County police department records specialist. She indicated that she knew of no reasons that would prevent her serving on the jury and rendering a fair verdict. Johnny Vines worked part-time in security, but had been employed "[o]ver 40 years [in] law enforcement" out of state and in security while in the military. R9 at 46, 48.

6

Both of his children were employed in corrections out of state. He stated that he had no emotional or language problems and knew of no other reasons that would prevent him from serving but did have a physical problem. The district court noted that the problem could be addressed by a recess if necessary.

Lips requested that the district court allow the parties' attorneys an opportunity to question the jury on their extensive law enforcement employment or experience and argued that, without adequate information, he was without grounds to strike them for cause. He objected to the district court's policy of questioning the jurors. The district court reminded Lips that he had failed to submit any proposed jury questions, and overruled his request and motion. Lips also objected to the district court's procedure for using peremptory strikes as prejudicial, and suggested that each party consider each juror individually.[6] The district court overruled his objection and denied his request.

Lips moved to strike jurors Rawluk, Vines, and Perez for cause, arguing that they would be prejudiced in favor of the Officers. The district court denied Lips' motion as to Rawluk and Vines but granted it as to Perez.[7]

---

[6] The district court explained that Lips, and then Hollywood and the Officers, were to provide all of their challenges for cause to the entire jury panel. After those jurors were excused, Lips, and then Hollywood and the Officers, were permitted to use their three peremptory challenges on any of the first eight jurors and any new jurors until the panel reached eight.

[7] Lips used his peremptory challenges to remove Rawluk, Vines and Maria Raspall, whose ex-husband was a U.S. customs inspector.

7

During the trial, Lips testified that he was watching television when two or three male police officers entered his house "cursing" and that Gloria was in her bedroom. R9 at 155-56. He said that the officers did not ask him any questions, but told him to shut up. Lips said that he then stood up and told them that they were in his house, that he had lived there for 48 years, and that he was "allowed to have a drink." Id. at 157-58, 224. Lips explained that one of the officers responded that he was "going to give [Lips] a[] beating if [Lips didn't] shut up" and then "hit [Lips] in the head with [a] flashlight so hard" that it knocked Lips "almost" unconscious and down to the coffee table. Id. at 157, 161, 164, 224, 227, 229. Lips maintained that the officers then "all" jumped on him, and "beat [him] to a pulp" by choking, hitting, punching, and slamming him. Id. at 157-59. He stated that the officers "ripp[ed his] shoulders out of [their] sockets" and pulled his arms behind him to handcuff him so tightly that his wrists were cut and one of his thumbs became numb. Id. at 160, 162-63. Lips was then taken into custody, led out of the residence, and arrested for domestic violence battery and obstruction of justice without violence.

Gloria testified that, after she moved back into the house, Lips sometimes drank about two quarts of alcohol per week. On the evening of the incident, Gloria reported that she had taken the bottle of alcohol away from Lips and hidden it in the clothes dryer. She testified that she did not tell the 911 operators during either

call that she had been assaulted by Lips. She did, however, answer "yes" when she was asked during her deposition whether she had informed the dispatcher that she had been assaulted by her husband and that testimony was introduced to the jury over Lips' objection. R12 at 784-86. Gloria responded that she did not remember answering "yes" but confirmed that she and Lips were arguing and that Lips had pulled her hair before she made the call. Id. at 786-87. She said that she did not tell the officers about the hair-pulling until the officers were already inside the house with Lips. Once the officers were inside the house, she heard yelling from inside and attempted to look, but was told to "sit down and not get up" and that, if she did not do as she was told, she was going to jail and her son was going to a foster home. Id. at 803-07. She was frightened and did not, therefore, look.

Although Hollywood and the Officers submitted a tape of Gloria's 911 call into evidence, the tape only contained Gloria's first call.[8] Lips' counsel attempted to introduce his taped copy of the 911 calls, which contained both calls, but his request was denied because it was neither on his exhibit list nor provided to Hollywood and the Officers.

Josh said that, when his parents began arguing that evening, he gave Lips the

---

[8] Hollywood provided Lips with a copy of the 911 tape on 2 August 2007. At the close of the evidence, Lips moved for sanctions against Hollywood for "forging the evidence" by only providing a tape of one of the two 911 calls. R15 at 1357-59. The district court denied the motion based on the same reasons as before, specifically that Lips' copy of the 911 calls-tape was not on his exhibit list and was not provided to Hollywood or the Officers.

liquor bottle that Gloria had hidden in the dryer. He explained that he was in the room that he shared with Gloria when the police came the second time. After they heard the police car door open, Josh said that he and Gloria walked out of the house as three of the officers walked into the house. At that time, his father was sitting on the living room couch. Josh heard his father and one of the officers talking for a few minutes and then he looked into the window when it sounded as if they were arguing. He observed one of the officers "take something," hit his father in the head, and shove his father onto the coffee table. R10 at 429, 433, 436, 444. Josh said that no one asked either Gloria or him any questions about what had happened at the house that night until after his father had been hit. In an affidavit that Josh filed with the officers, he stated that earlier in the evening he had seen Lips pull Gloria's hair.

When Officers Stetkar and Zorsky arrived at the Lips' residence, they met with Gloria and Josh outside while Lips remained inside. Gloria informed the officers as soon as they arrived that Lips was intoxicated and had grabbed her by the hair.[9] Stetkar told one of the other officers about the hair-pulling incident. She did not see the activity between Lips and the officers inside the house but did hear a lot of yelling and cursing.

---

[9] Because hair-pulling is considered a battery, the Officers believed that this information established probable cause for an arrest.

Officer Gianino explained that, when he arrived at the residence on the violent domestic disturbance dispatch, he observed Stetkar and Korsky speaking with Gloria and Josh and the front door of the residence open. Upon hearing a loud, male voice making derogatory remarks coming from inside the residence, he entered the house without permission because Lips was alone inside, it was a domestic violence call, he needed to investigate, and he wanted to calm the individual. Gianino found Lips sitting on the couch and yelling in a slurred voice, and observed four shotguns and a sword on a rack directly behind him. Gianino tried to calm down Lips by asking him to talk about what was going on and, in the interest of officer safety, instructed him to stay seated because of the accessibility of the weapons, his demeanor, and his intoxicated appearance.

Lips, however, did not obey Gianino's instructions. He responded that it was his house, and that he could walk around and do what he wanted. He then walked over to Gianino and pushed Gianino in the chest. In response, Gianino attempted to use a "straight arm bar takedown" on Lips but Lips pulled back and they fell onto the couch. R12 at 878-80. He explained that no one hit, kicked or struck Lips in any way.[10] He testified that he never carried a large flashlight and,

---

[10] Bairerlein and Hoeflinger also testified that neither Gianino nor they hit, kicked, or struck Lips. No evidence was presented that Officers Stetkar and Zorsky physically participated in Lips' arrest.

11

over Lips' objection, was permitted to show the jury his gun belt and flashlight, although neither was on the exhibit list. Gianino, with the assistance of Officers Bairerlein and Hoeflinger, finally handcuffed Lips.

On cross-examination, Gianino testified that he was not the charging officer but that he arrested Lips after Lips pushed him. Lips' counsel then asked whether Lips' push "hurt" Gianino and Gianino responded "I wasn't injured physically, no." R13 at 918. When Lips' counsel followed up with three more similar questions, the Officer's counsel objected. The district sustained the objections and, when Lips' counsel posed a fourth similar question, declared that the cross-examination was over. See id. When Lips' counsel objected, the district court explained that if he was "going to keep asking questions that [had] sustained objections . . . , [the district court was] not going to permit it," and directed Lips' counsel to "[s]it down." Id. at 918-19. Lips' counsel attempted to explain that he was "halfway" through his question and was planning to "rephrase it," but was twice again told to sit down. Id. at 919.

After the jury was dismissed for the day, the district court advised Lips' counsel that it would "consider permitting [him] to reopen cross-examination of Officer Gianino" if he proffered questions that were neither objectionable nor non-repetitive but that it would not "permit [him] to continue to ask the same question over and over again" after an objection was sustained. Id. at 920.

12

The next day of court, Lips moved for leave to resume the cross-examination and for a curative instruction. Hollywood objected to the curative instruction and stated that, if the district court reconsidered re-opening Gianino's cross-examination, "everything should continue on." R14 at 928-29. The district court then denied Lips' request, noting that he had failed to proffer the questions that he was directed to provide. After Lips' counsel explained that he had the questions ready to proffer, the district court said that it would consider the proffered questions. Upon reviewing the proffer, however, the district court observed that it was "clearly an outline of what [Lips] intended to ask all of the police officers, and . . . clearly not what [it] had asked for." Id. at 931. The district court then declared the cross-examination over, despite Lips' counsel objections and attempted explanation.

Dr. Steven Brown, a neurologist, testified that he initially examined Lips on 22 April 2005 for complaints of back and shoulder pain, numbness in his arms, headaches, and problems with anxiety, concentration, depression, dizziness, irritability, memory, sleeplessness, and tinnitus. See R11 at 466, 468-70. Brown observed healing lacerations on Lips' left forearm and right wrist, tenderness on his central forehead, weakness and decreased sensation in his left arm, significant tenderness and spasm in his neck and mid- and low-back, a decreased range of motion in his left shoulder, neck and back, and that Lips was "in a significant

13

amount of distress." Id. at 470-79. Brown tentatively diagnosed Lips with radial nerve injury on his wrist; sprain and strains in the muscles in his neck, mid-back, and low back; left shoulder derangement; post-concussion syndrome with vertigo; post-traumatic headaches; and depression. He then ordered further testing, including magnetic resonance imaging ("MRI"). The tests showed that Lips had bone spurs predating the left shoulder incident which could have been asymptomatic until the incident.

Dr. Robert Kagan, a radiologist, reviewed Lips' MRIs and observed that he saw no objective evidence such as swelling of any recent injury. See id. at 639-40, 656-57. He believed that any injuries occurred between five to thirty years before the MRIs were taken. Although Lips objected that Kagan's report was filed more than five months after the initial discovery cutoff, the district court overruled the objection on the ground that Lips should have deposed Kagan when discovery was reopened.[11] See id. at 658, 662. Lips' motion to strike Kagan's testimony as not timely produced was denied.

Dr. Alan Herskowitz, a neurologist, found no evidence of any neurologic damage or injury when he examined Lips.[12] See R13 at 716, 724. He noted that

---

[11] Kagan was listed as an expert witness on Hollywood's Witness List, filed on 17 October 2007.

[12] The Officers also had Lips evaluated by Dr. Christopher Troiano, but did not call him as a witness during the trial.

Lips complained of tenderness in his shoulders and neck but could "move them okay." Id. at 724. He commented that Lips' other physical impairments, specifically his bulging disks, were common to men of his age and could have been caused by earlier accidents, injuries, sports or heavy lifting. Lips' objection that Herskowitz's conclusions was beyond the scope of his report was overruled. See id. at 732. Herskowitz reviewed Brown's report and Lips' MRIs, but denied having seen Kagan's reports or the MRI studies done by him.

Dr. Jacqueline Valdes, a neuropsychologist, diagnosed Lips with "symptom exaggeration," consistent with "malingering." R14 at 963-64, 992, 994, 1006-07, 1031-32. Valdes made her diagnosis on the basis of the results from tests of Lips that she administered as well as the information she received from Dr. Alexander Kusch, a clinical psychologist who had examined Lips. She noted that some of Lips' problems with attention and concentration could be caused by emotional distress or chronic pain but that the variability and inconsistencies in Lips' exam performances were "not typical for individuals who have experienced mild traumatic brain injury." Id. at 991, 998-1000, 1005. She observed that Lips "report[ed] severe emotional distress" in most symptom areas, was "tearful" about changes in his life, and became frustrated with difficult tasks, but otherwise interacted appropriately and did not show signs of significant problems. Id. at

1002-07. The district court overruled Lips' counsel's objections to Valdes's testimony, refused counsel's request to use medical journal articles to impeach Valdes' diagnosis, and denied Lips' motion to strike Valdes' testimony.

Dr. Kusch examined Lips and reviewed Dr. Valdes' data. He found that Lips was suffering from a pain disorder with psychological factors and the medical condition of multiple back and neck injuries. He noted that Lips was struggling in his profession because he was unable to perform his occupation as a mechanic. He diagnosed Lips with an anxious or significant depressive condition, post-traumatic stress disorder, difficulty sleeping, and mild problems with concentration, cognition, and his working memory. He explained that, as a result of his valid physical pain, Lips exaggerated many of his symptoms as "a crying out for help." R11 at 577, 592-94. Kusch observed that Lips' exaggeration of his symptoms supported the data that showed that he had significant emotional and physical problems, and discounted any possibility that Lips was malingering.[13]

The day before the last day of trial, the Officers advised the district court that they planned to use excerpts from Lips' videotaped deposition during their closing arguments. The district court noted that, if Lips objected, Lips could designate portions of the deposition to refute the Officers' argument. Lips objected

---

[13] The Officers' objection to Kusch's reference to "literature" regarding psychological evaluations during his explanation that Lips' exaggeration supported the validity of his underlying conditions was sustained. R11 at 611-12.

but the district court found the requested segments relevant.

Lips' attorney did not complete his closing argument within the allotted forty-five minutes and did not reserve time for a rebuttal argument.[14] During the Officers' closing argument, an excerpt from Lips' deposition was played for the jury.

When instructing the jury, the district court reminded the jury that it was to apply and follow the law, not be influenced by prejudice or sympathy, and consider only the evidence submitted during the trial after determining the credibility of the witnesses. After the jury left to deliberate, Lips argued that the deposition excerpt was "intentionally deceptive" but the district court disagreed and denied his

---

[14] The parties requested a total of two and one-half hours for closing arguments: Lips requested an hour to one and one-half hours, and Hollywood and the Officers each requested 30 minutes. The district court permitted the parties a total of one hour and thirty minutes: 45 minutes for Lips, and 22.5 minutes each for Hollywood and the Officers. When Lips protested that he "really need[ed] more than 45 minutes," the district court advised him to "Focus. This is not a complicated case. Focus." R14 at 1162.

The district court explained that the timer would be set at 45 minutes and would provide a flashing green light when there were two minutes left, followed by a yellow warning light. It explained that the parties could reserve time for rebuttal but that the court would not stop argument and would permit use of the entire 45 minutes. Lips' attorney asked that the timer be set at 35 minutes. At 35 minutes, however, Lips' attorney had not concluded his argument and continued. After Lips' attorney finished his argument, the district court advised him that his "[t]ime [was] up." R17 at 1400. When the district court recessed in between Hollywood and the Officers' arguments, Lips' attorney asked if he had "10 minutes in . . . rebuttal, right?" Id. at 1416. The district court responded "No, sir. You used your ten minutes. You have no time left for rebuttal. You used 46 and a half minutes." Id. Lips' attorney then moved for "a five minute rebuttal" which the district court denied. Id. The district court noted that he "had 45 minutes. This trial was six days long, 45 minutes is more than enough time. . . . you've used your 45 minutes. . . . You actually went to 46 and a half minutes. . . . So, now, I'm not going to give you . . . five or ten minutes left for rebuttal" Id. at 1416-17. Lips' attorney again asked for two minutes, but the district court responded "None. Zero." Id. at 1417.

17

objection. R16 at 1448-52. The jury returned a verdict in favor of the defendants. R4 at 174.

Lips' motion for a new trial was denied. Lips timely appealed, arguing that the district court abused its discretion in (1) denying Lips' motion to depose Valdes and in admitting Kagan's and Herskowitz's expert opinions; (2) conducting voir dire and ruling jury selection; (3) terminating Lips' cross-examination of Gianino; (4) admitting Hollywood's recording of Lips' 911 call; and (5) allowing the Officers to publish portions of Lips' deposition during their closing argument.

## II. DISCUSSION

Each of these issues is reviewed for abuse of discretion. The denial of a continuance is within a district court's broad discretion and will not be overturned unless it is arbitrary or unreasonable. Fowler v. Jones, 899 F.2d 1088, 1093-94 (11th Cir. 1990). Rulings regarding the scope of voir dire are within a district court's discretion and will not be reversed absent a showing of error and prejudice. Keyes v. Lauga, 635 F.2d 330, 333 (5th Cir. 1981).[15] Reasonable limitations on cross-examination are also within the district court's discretion. United States v. Onori, 535 F.2d 938, 945 (5th Cir. 1976). Finally, evidentiary rulings, including determinations of relevance, are within the district court's discretion and are not

_____

[15] Pursuant to Bonner v. Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), all cases decided by the Fifth Circuit prior to 30 September 1981 were adopted as binding precedent.

subject to reversal absent the effect of substantial prejudice. <u>Cabello v. Fernandez-Larios</u>, 402 F.3d 1148, 1161 (11th Cir. 2005) (per curiam); <u>Wright v. CSX Transp., Inc.</u>, 375 F.3d 1252, 1260 (11th Cir. 2004) (per curiam).

A. <u>Lips' Motion to Depose Valdes, and the Admission of Kagan's and Herskowitz's Opinions</u>

Lips argues that the district court's refusal to allow him to depose Valdes prejudiced him by preventing him from striking Valdes as an expert or rebutting Valdes' opinion that Lips was malingering. He also contends that, because he was barred from using a medical journal during his cross-examination of Valdes, he was unable to prove that her testimony was false and incompetent. He maintains that the district court improperly permitted Kagan's testimony despite the Officers' last-minute submission of his opinions and failure to move to submit the opinions out of time. He explains that this late submission prejudiced him because it changed the defense strategy. He claims that the district court improperly permitted Herskowitz to testify to opinions that were neither contained in nor supported by his report and, specifically, to testify as to Lips' preexisting physiological problems.

Lips was initially diagnosed with mental health disorders, including anxiety, depression, and memory problems, by Dr. Brown in April 2005. Lips sought and was granted discovery extensions until 28 February, giving him three additional

19

weeks to retain a neuropsychologist to conduct further testing. Kagan's reports were served on 31 January and 1 February. Valdes' report was provided to Lips on 21 February, but the district court did not permit additional time for any depositions and none were conducted by Lips, Hollywood, or the Officers. With the trial date set for 17 March, Lips had three weeks to review Valdes' report with his expert and to address her conclusion that he was a malingerer.

Herskowitz testified that he found no evidence of neurologic damage or injury in his examinations of Lips and that Lips' other physical impairments could have been caused earlier than the incident. Lips' objections that this opinion was outside the scope of his report and his question as to the correlation between Herskowitz's and Brown's findings were overruled.

We allow considerable deference to the district court's evidentiary rulings, and consider it to have abused its discretion when it applied the wrong law, followed the wrong procedure, considered erroneous facts, or clearly erred in judgment. United States v. Brown, 415 F.3d 1257, 1265-66 (11th Cir. 2005). We will not reverse such a ruling "unless [it] resulted in a substantial prejudicial effect." Wright, 375 F.3d at 1260 (quotation marks and citation omitted).

Despite Brown's having diagnosed Lips with mental health issues as early as April 2005, Lips did not seek any neuropsychology treatment or further testing until 2007. He did not depose Valdes, Herskowitz, or Kusch, even after their

20

initial submission of lengthy reports. The district court did not deny Lips an opportunity to depose Valdes, and granted his extensions to conduct any necessary discovery. Any delays in such depositions resulted from Lips' counsel's trial schedule and not from any actions by the district court. The record does not support Lips' claim that Herskowitz testified as to any of Lips' psychological conditions or Brown's findings. Lips has failed to establish any prejudice from the district court's evidentiary rulings.

B. Voir Dire and Jury Selection

Lips contends that, by conducting the voir dire itself, the district court denied him sufficient information for an informed jury selection. He maintains that the district court's voir dire failed to satisfy Federal Rule of Civil Procedure 47. He argues that he was prejudiced by the denial of his motion to strike for cause three police officers from the jury panel because it forced him to use his peremptory challenges to eliminate them. He also maintains that the district court's requirement that he use his peremptory challenges before Hollywood and the Officers prejudiced him by extending the value of their strikes.

Through the initial trial order, the parties were instructed to submit proposed voir dire questions one day before calendar call. Lips, however, did not submit any questions. The trial court advised the parties before the trial began that, after the jurors were questioned by the court on the questions submitted by the parties, the

21

court could, but usually did not, permit the lawyers to ask additional questions.

During federal voir dire, district judges are granted substantial control and may conduct the entire voir dire themselves. Edmonson v. Leesville Concrete Co., 500 U.S. 614, 623, 111 S. Ct. 2077, 2084 (1991). Under Federal Rule of Civil Procedure 47(a), a district court

> may permit the parties or their attorneys to examine prospective jurors or may itself do so. If the court examines the jurors, it must permit the parties or their attorneys to make any further inquiry it considers proper, or must itself ask any of their additional questions it considers proper.

Fed. R. Civ. P. 47(a).

When the trial judge conducts the voir dire, it must be conducted so competently, completely, and thoroughly that the prospective jurors' histories and personal prejudices are revealed. Vezina v. Theriot Marine Serv., Inc., 610 F.2d 251 (5th Cir. 1980). The district court has broad discretion to decide "whether to propound questions submitted by counsel and also . . . whether jurors should be questioned collectively or individually out of the presence of the other jurors," United States v. Magana-Arevalo, 639 F.2d 226, 228-29 (5th Cir. 1981), or whether to excuse a juror for cause, Irwin v. Dowd, 366 U.S. 717, 724 n.4, 81 S. Ct. 1639, 1643 n.4 (1961). The district court's decision as to the impartiality of the jurors must be guided by its evaluation of the jurors' responses to questioning and observation of the jurors' attitudes and gestures. United States v. Nash, 910 F.2d

749, 753 (11th Cir. 1990). We will not reverse a district court's decision based on the voir dire that it conducted unless it is shown with specificity that the voir dire did not provide a reasonable assurance that the jurors' prejudices could be discovered. United States v. Brooks, 670 F.2d 148, 152 (11th Cir. 1982).

The district court's pretrial order advised the parties that each could submit proposed voir dire questions at least one day before calendar call. Hollywood and the Officers submitted such questions; Lips did not. The district court incorporated Hollywood and the Officers' proposed questions into its jury instructions where it found them relevant. When Lips requested further questioning of an individual juror, the district court granted the request and proceeded with further questioning.

During the voir dire, the jurors were advised that they would be questioned to determine their impartiality. Although three members of the jury pool worked for law enforcement agencies, each juror was asked questions about their background and ability to remain fair and impartial. One of the jurors admitted that he could not be fair and impartial and was excused by the district court. The other jurors indicated that their background would not impact their ability to remain impartial. The jurors were also reminded, before beginning deliberations, that their judgment was to be impartial and limited to the evidence which they considered credible.

Lips failed to comply with the district court's voir dire process, and the

district court granted his request for additional questioning where appropriate. The district court advised the jurors on the need for impartiality, and excused a juror who indicated that he could not be fair and impartial. Lips fails to establish any prejudice as a result of the district court's voir dire process or to present any authority to substantiate his position that police employees or officers are inherently biased toward police officers. The district court did not abuse its discretion in conducting voir dire.[16]

## C. Lips' cross-examination of Gianino

Lips argues that the district court's termination of his cross-examination of Gianino, without warning, deprived him of his right to cross-examination.

Although cross-examination is the "principal means" of testing a witness' credibility and the truth of his testimony, a district court is vested with broad discretion "to preclude repetitive and unduly harassing interrogation." Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974); see also Fed. R. Evid. 611(a).

During Gianino's cross-examination, Lips' attorney continued to ask the same questions to which the district court had sustained objections. When the

---

[16] We also note that, despite Lips' argument, the district court's procedure for the use of peremptory challenges was proper given the district court's considerable discretion and control over the voir dire process. See United States v. Houston, 456 F.3d 1328, 1332 (11th Cir. 2006) (where the parties simultaneously filed their strikes).

same questions were again repeated, the court warned Lips and provided him with an opportunity to resume the cross-examination upon compliance with the court's instructions. Lips, however, failed to so comply. The district court did not terminate Lip's cross-examination of Gianino without warning and did not abuse its discretion in ultimately terminating the examination.

D. <u>Admission of Hollywood's recording of and refusal to admit Gloria's 911 Calls</u>

Lips suggests that the district court's admission of Hollywood's recording of Gloria's 911 call and refusal to allow the introduction of Lips' copy of the calls allowed the jury to be exposed to Hollywood's alleged falsification of the call.

During the initial discovery period, Hollywood obtained a copy of the 911 calls from the Broward County State Attorney's office, listed their copy of the 911 call on their Exhibit List, and provided Lips with a copy. Hollywood's tape only contained one of the 911 calls, and their counsel explained that, although they had requested the second call, they never received it. Lips's attorney failed to listen to the provided copy, however, during the intervening six months. The district court allowed Lips' attorney an opportunity to listen to the admitted evidence before it was played to the jury, but he did not take the time to do so.

During the trial, Lips' attorney argued that there were actually two 911 calls but that only Hollywood's tape contained only one of the 911 calls, and that Hollywood had "destroyed" the original tape and introduced a "falsified" tape.

25

R14 at 943-44.  Lips' attorney admitted that he had sought at copy of the tape

containing both of the 911 calls four days after Lips' 2005 arrest, had been in

possession of a copy of the tape that contained both calls throughout the entire

litigation and had not provided them to Hollywood or the Officers, and that no

attorneys, other than himself, had listened to the tape.  He explained that he failed

to provide Hollywood or the Officers with a copy of his tape because he "thought

they were playing games" and did not see a reason to provide them with a copy of

the same tape that they had provided him.  R15 at 1358-59.

"If a party fails to provide information . . ., the party is not allowed to use

that information . . . to supply evidence . . . at a trial, unless the failure was

substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  In determining

whether the failure to disclose was justified or harmless, we consider the non-

disclosing party's explanation for its failure to disclose, the importance of the

information, and any prejudice to the opposing party if the information had been

admitted.  Romero v. Drummond Co., 552 F.3d 1303, 1321 (11th Cir. 2008).

The district court did not abuse its discretion in admitting Hollywood's copy

of the 911 calls tape and denying Lips' request to admit his copy.  There was no

evidence submitted that Hollywood forged the 911 call tape,[17] and Lips was not

---

[17]  We note that this is not the first time that Lips' attorney, Jeffrey Alan Norkin, has accused opposing counsel of illegal and unethical conduct.  The Florida Bar v. Norkin, TFB File No. 2001-70,385(11C) (2003) (publicly reprimanding Norkin for "falsely accusing opposing

26

prejudiced by the district court's refusal to permit him to enter a tape of the second call into evidence, as Gloria testified that she did not report to the 911 dispatch that Lips assaulted her. The Officers were unable to impeach Gloria based on the differences in her deposition and trial testimony about the calls because they did not have a copy of both calls on the tape that they had obtained. Lips failed to disclose his copy of the 911 calls to either Hollywood or to the Officers, and did not list his copy as an exhibit. Lip's attorney admitted that he had his copy of the tape in his possession during the entire litigation and did not review Hollywood's tape based on his own lack of diligence. See Romero, 552 F.3d at 1322 (finding no abuse of discretion in the exclusion of evidence when the failure to disclose was based in part on plaintiffs' own lack of diligence).

E. Publication of Lips' Deposition During Officers' Closing Argument

Lips argues that, by permitting the use of portions of Lips' deposition during the Officers' closing argument, the district court allowed the jury to be deceived.

Before the closing arguments, Lips' attorney objected to the Officers' intention to use excerpts of his videotaped deposition during their closing argument. The district judge found the Officers' excerpts showed inconsistencies with Lips' trial testimony and were relevant, admitted them as evidence, and noted

_____

counsel of illegal and unethical conduct" during discovery).

27

that Lips could supplement the excerpts with other portions of the deposition.[18]

The district court did not abuse its discretion in allowing the Officers to publish portions of Lips' deposition. We will only reverse a district court's rulings regarding closing arguments if the challenged argument was "plainly unwarranted and clearly injurious." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1282 (11th Cir. 2008) (quotation marks citation and omitted). Here, the deposition excerpts were allowable and warranted as they were relevant to Lips' trial testimony. See Commercial Credit Equip. Corp. v. L&A Contracting Co., 549 F.2d 979, 981 (5th Cir. 1977). Lips is also unable to show that he was injured by the use of the deposition excerpts. He was provided with a copy of the excerpts before closing argument and had the opportunity to address them and to show additional portions of the deposition during his closing argument or rebuttal. He failed to do so.

### III. CONCLUSION

Lips has failed to demonstrate that the district court abused its discretion in denying his motion to depose Valdes and in admitting Kagan's and Herskowitz's expert opinions; conducting voir dire and during jury selection; terminating Lips' cross-examination of Gianino; admitting Hollywood's recording of Lips' 911 call;

---

[18] In the excerpts, Lips denied using alcohol or battering his wife, stated that he did not remember his response to the officers' instruction for him to remain seated, commented that a small flashlight would not have hurt him, and indicated that his right shoulder was damaged.

and allowing the Officers to publish portions of Lips' deposition during their closing argument. Accordingly, we affirm the district court's denial of Lips motion for new trial.

**AFFIRMED.**